602 So.2d 961 (1992)
CHARLES B. PITTS REAL ESTATE, INC., and Hyde Park Realty, Inc., Appellants,
v.
Betty J. HATER, as Personal Representative of the Estate of John H. Hater; Betty J. Hater; Jeanne A. Hater; Harry J. Hater, Jr., and Margaret G. Hater, his wife, Appellees.
Nos. 89-02344, 90-02339.
District Court of Appeal of Florida, Second District.
April 24, 1992.
*962 William N. Graham of William N. Graham, P.A., Tampa, for appellants.
Robert A. Mora of Allen, Dell, Frank & Trinkle, Tampa, for appellees.
ALTENBERND, Judge.
Charles B. Pitts Real Estate, Inc., and Hyde Park Realty, Inc. (the Brokers), appeal an adverse judgment on their claim for a real estate commission against Betty J. Hater, as Personal Representative of the Estate of John H. Hater; and Betty J. Hater, Jeanne A. Hater, Harry J. Hater, Jr., and Margaret G. Hater, individually (the Haters). After oral argument on the thirteen issues raised by the Brokers on appeal and a full review of the record, the court decided that the case should be affirmed and that the issues did not warrant a written opinion. The Brokers' motion for rehearing, however, suggests to the court that a line of questioning by the panel at oral argument has inadvertently created unwarranted concerns. We affirm, but grant rehearing to explain the basis of this court's ruling on the most important issue.

I. THE BASIC FACTS
On August 1, 1982, the Haters entered into a real estate sales contract with Florida Federal Development Corporation (FFD). Under the agreement, the Haters planned to sell a sizable tract of land on Waters Avenue in Hillsborough County to FFD for $33,000 per net acre. Although the contract does not disclose the total acreage involved or the total price to be paid, the total contemplated price was approximately $6,600,000.
The agreement was prepared on a standard Florida Bar "Contract for Sale of Real Estate." The agreement, however, contains blanks, deletions, and addendums that render it far from standard. In many respects, the agreement is more of an option to purchase than a typical agreement to sell. The agreement does not schedule a closing, but states that "closing shall take place on or prior to one year from the date of this contract; provided, however, at the option of Buyer and only if Buyer has completed all of its obligations thereto, the closing may be extended for a reasonable period of time to permit issuance of final approvals by all governmental agencies having jurisdiction."
Despite this real estate's significant value and the uncertainty created by the unscheduled closing, FFD was only required to deposit $5,000. The Haters' damages for any default by FFD were limited to this deposit. Apparently, this agreement was reached because FFD did not wish to close on the property unless it replatted the property and made certain that the industrial park it wished to develop would be acceptable under the applicable zoning requirements. FFD was obligated to resolve the zoning questions and the Haters agreed to fully cooperate in this task.
The standard brokerage agreement in the real estate sales contract was not executed. In a separate agreement, the Haters and the Brokers agreed that the Brokers would be paid $400,000 "at time of closing" for finding a ready, willing, and able buyer. If the transaction did not close because of FFD's default, the Brokers received only 50% of the deposit, i.e., $2,500. If the transaction did not close "because of refusal or failure of Seller to perform," the Haters were obligated to pay the fee in full to the Brokers.
The closing did not occur within the first year. The initial attempt by FFD to obtain zoning approval failed. On July 6, 1983, FFD wrote to the Haters' attorney, Mr. Richard Reeves, advising that it was negotiating a sale of its contract rights to a third party for $4,000. FFD wanted to extend the closing date so that it could effect this arrangement. Mr. Reeves responded to this request and objected to an extension that "would be nothing more than giving you an exclusive option to sell the property for an indefinite period of time." He demanded that FFD announce in writing whether it intended to close on August 1, 1983.
FFD replied with a letter indicating that it had already entered into an agreement to sell one-half of its interest for $840,000. It served notice that it was exercising its option for an extension to close. Because no zoning application was pending in July 1983, it appears that the zoning difficulties *963 could not be resolved any earlier than March 1984. It does not appear that FFD planned to close unless and until those problems were resolved. The Haters decided that the status of the zoning did not require them to extend the date of the closing. Thus, they notified FFD in mid-August 1983 that the agreement had terminated. Thereafter, they maintained that the Brokers were entitled to $2,500, and the Brokers, of course, maintained they were entitled to $400,000.
Before the end of 1983, FFD filed a lawsuit against the Haters for specific performance of the contract. The Brokers were not parties to that lawsuit and did not attempt to intervene, even though their entitlement to a brokerage fee depended upon a determination of whether the Haters or FFD had prevented the closing. Instead, the Brokers filed this separate lawsuit in June 1984.
In December 1984, the Haters and FFD jointly stipulated to a dismissal of the other lawsuit. The Haters paid FFD $540,000 for the settlement and received an assignment of the buyers' rights, if any, under the agreement to sell.
This case was ultimately tried before a jury in January 1989. The jury determined that the transaction had not closed due to the failure of FFD to perform and, accordingly, awarded the Brokers only $2,500. The Brokers challenge this award in this appeal. The Brokers have raised numerous issues, but only two interrelated issues warrant discussion.[1]

II. THE RELEVANCE OF THE SETTLEMENT IN THE OTHER LAWSUIT
The Brokers argue that they had the right to disclose to the jury the circumstances of the settlement between the Haters and FFD. We conclude that the trial court did not abuse its discretion in prohibiting evidence of the settlement. As a general rule, offers to compromise a disputed claim are not admissible to prove liability for the claim. § 90.408, Fla. Stat. (1989); see Bill Currie Ford, Inc. v. Cash, 252 So.2d 407 (Fla.2d DCA 1971), cert. denied, 256 So.2d 513 (Fla. 1972); City of Coral Gables v. Jordan, 186 So.2d 60 (Fla.3d DCA), aff'd, 191 So.2d 38 (Fla. 1966).
Although the settlement in the case between the Haters and FFD was not an offer or settlement in this case, it was a settlement of a closely related issue in the earlier case. It is quite analogous to a settlement with a codefendant. Moreover, there were many logical and practical reasons for the Haters to pay $540,000 to settle that case, even if they believed they could ultimately prevail in that lawsuit. As a practical matter, the Haters would be unable to develop or sell the property as long as it was the subject of litigation. Thus, the settlement does not constitute an admission that they were the breaching party.
The Brokers have not demonstrated that the settlement had any probative value that was not substantially outweighed by the danger of unfair prejudice or confusion. § 90.403, Fla. Stat. (1989). We have not overlooked the possibility that a settlement of this sort could "color" the testimony of the settling parties in the subsequent lawsuit and that the settlement might become admissible on an issue of credibility. In this case, the critical witnesses from FFD had been deposed in at least one of the lawsuits before the settlement. One of the key witnesses from FFD had given the Brokers a lengthy affidavit to support their motion for summary judgment in this case long before the settlement. Thus, the Brokers did not establish in the trial court that this settlement fit within any conceivable exception to the general rule against admissibility.

*964 III. LEGAL MEMORANDA PREPARED BY THE HATERS' ATTORNEYS WERE NEITHER DISCOVERABLE NOR ADMISSIBLE
The Brokers also argue that they were entitled to discover and to admit into evidence two memoranda prepared by the Haters' attorneys in September 1983. They are aware of these memoranda because their existence was disclosed during discovery. These memoranda concern the legal issue of whether the Haters or FFD breached the real estate contract.[2]
The Brokers argue that these memoranda are discoverable because the Haters and Mr. Reeves waived the attorney-client privilege by allowing certain testimony from Mr. Reeves in both proceedings. When a real estate transaction or business arrangement collapses, it is sometimes necessary for lawyers to disclose information in litigation that their clients might otherwise keep inviolate under the lawyer-client privilege. See § 90.502, Fla. Stat. (1989). During the one-year life of this agreement, Mr. Reeves was communicating directly with the principals at FFD, who were experienced developers. It is apparent that many of the documents he prepared prior to mid-August 1983 were communications that he and the Haters intended for disclosure to FFD. Thus, his file undoubtedly contained many documents that were not subject to the lawyer-client privilege in this specific action. § 90.502(1)(c), Fla. Stat. (1989).
The issue here, however, is not actually one of privilege, but rather of work product. See State v. Rabin, 495 So.2d 257 (Fla. 3d DCA 1986); Alachua General Hosp., Inc. v. Zimmer USA, Inc., 403 So.2d 1087 (Fla. 1st DCA 1981). The two memoranda prepared in September 1983 were clearly prepared in anticipation of the litigation arising out of the failed transaction. Although the memoranda discuss the legal issue of whether the Haters did everything necessary to cooperate in the application for zoning, we need not determine whether part or all of the work-product protection provided in the first lawsuit ended with its settlement. Cf. Rabin (where client waived privilege, "fact" work product obtained in prior-terminated litigation is discoverable in subsequent litigation, but not "opinion" work product) with Alachua General (without distinguishing between "fact" or "opinion" work product, court held that information obtained by attorney in investigation was work product as to initial litigation and was only discoverable in present litigation upon showing of undue hardship). It is obvious that the legal issue discussed in the memoranda related to both subsequent lawsuits. We conclude that the trial court was correct in ruling that these memoranda were work product disclosing "the mental impressions, conclusions, opinions or legal theories of an attorney ... concerning the litigation." Fla. R.Civ.P. 1.280(b)(3).
At the oral argument, the panel expressed concern that the memoranda might have become discoverable and admissible during the trial because of a perceived factual discrepancy between Richard Reeves' trial testimony and the content of the memoranda. These questions have understandably made the Brokers more anxious to review the undisclosed documents. Our questions, however, were caused by our initial misunderstanding of the content of the record on appeal. On a thorough review of the record following oral argument, we concluded that no discrepancy in fact existed and that our initial concerns had been unwarranted.
Affirmed.
FRANK, A.C.J., and PARKER, J., concur.
NOTES
[1] Despite the length of this very abbreviated statement of the facts, we note that the appellants' initial brief contained only a 1 1/2-page statement of the case and facts. Although we appreciate brevity in the briefs submitted to this court, the factual presentation in this case did not adequately summarize the evidence at trial. This weakness in the briefing was a major factor contributing to a factual misunderstanding by the judges during oral argument. We discovered our mistake while reviewing the actual record after the oral argument. This event certainly underscores the practical need for a sufficient statement of the facts in the initial brief, with adequate citations to the record.
[2] Because these documents have been made available to this court as a sealed exhibit, we are fully aware of their content, even though the Brokers have been unable to view them.