762 So.2d 870 (2000)
Michael STOLL, Appellant,
v.
STATE of Florida, Appellee.
No. SC93276.
Supreme Court of Florida.
April 6, 2000.
Rehearing and/or Clarification Denied July 13, 2000.
*871 James B. Gibson, Public Defender, and Michael S. Becker, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Michael Stoll. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

*872 BACKGROUND
Stoll was found guilty of premeditated murder in the first degree and was sentenced to death on June 9, 1998, for the murder of his wife, Julie Stoll, on November 3, 1994. The primary witness for the State was Christopher Stewart, who lived with the Stolls and worked for Stoll. At the time that the murder was committed, Stewart was nineteen years old and Stoll was thirty-three years old.
At trial, Stewart testified in graphic detail about the plans leading up to the murder, as well as about the details of the murder itself. Stewart testified that he was the one who actually killed Julie Stoll, but that he did so at the personal direction of Stoll, who planned the murder and was present when Julie Stoll was killed.[1]
Stoll himself testified at trial and denied directing or assisting Stewart in the killing of his wife, although he did admit to "participat[ing] after the fact." In addition, Stoll discussed a prior domestic violence charge brought by his wife, and he testified that he and his wife had an argument concerning that charge only days before the murder.
The jury found Stoll guilty of premeditated murder in the first degree and thereafter returned an advisory sentence of death, with a vote of seven to five. As to the relative culpability of Stewart and Stoll, the trial court found that
[t]he culpability between Stewart and [Michael] Stoll was not equal. Michael Stoll planned and caused the death of Julie Stoll utilizing Christopher Stewart as the means for this purpose. Christopher Stewart had no reason to kill Julie Stoll other than of his reliance upon and direction from Michael Stoll. Christopher Stewart was the club used by Michael Stoll to effectuate the death of Julie Stoll.
After weighing the aggravating factors[2] against the mitigating factors,[3] the trial court found that the mitigating circumstances did not outweigh the aggravating circumstances and thereafter imposed a sentence of death.
On appeal, Stoll raises four issues regarding the guilt phase of the trial[4] and two issues regarding the penalty phase of the trial.[5] We agree that reversal is required because of the errors raised in two of Stoll's guilt phase issues: (1) permitting the State to call Dana Martin as a rebuttal witness; and (2) admitting into evidence a prior statement by Julie Stoll.

DANA MARTIN'S REBUTTAL TESTIMONY
We first consider the error in allowing Dana Martin to testify as a rebuttal witness. *873 During its case-in-chief, the State called Martin, a longtime friend of Julie Stoll. Martin testified that as soon as she heard that Julie Stoll was dead, she went to the Stolls' house. As she began to explain why she went to the Stolls' house, defense counsel objected and the trial court sustained the objection as to allowing Martin to testify as to hearsay. Thereafter, in rebuttal, the State again called Martin, and again, defense counsel objected on the basis of hearsay. The trial court overruled this objection whereupon Martin testified that:
Julie made me promise her in August [1994] when she came to my house one Saturday morning and was upset and shaken and crying, and they had been fighting all night the night before, that if anything ever happened to her I would go to the police and tell them that Michael did it or had it done. That he had threatened to kill her more than once and she ... she knew he would do it.
Martin also revealed that one month before that incident, she noticed that Julie Stoll was bruised and that Julie Stoll had told Martin that "Michael did it. And that [Julie] was afraid that he was going to kill her."
In response to Stoll's argument that Martin's testimony concerning what Julie Stoll told her constituted inadmissible hearsay, the State contends that these statements fell within one of two recognized exceptions to the hearsay rule and that they were properly admitted as rebuttal evidence. In particular, the State argues that Martin's testimony is admissible under the excited utterance exception, section 90.803(2), Florida Statutes (1997), and the state-of-mind exception, section 90.803(3). Alternatively, the State argues these statements became admissible as rebuttal evidence to impeach statements that Stoll made.
As to the State's argument that the statements constituted excited utterances, section 90.803(2) provides for the admission of "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Accordingly, we have previously held that in order for an excited utterance to be admissible, the following requirements must be met: (1) there must have been an event startling enough to cause nervous excitement; (2) the statement must have been made before there was time to contrive or misrepresent; and (3) the statement must have been made while the person was under the stress of excitement caused by the startling event. See State v. Jano, 524 So.2d 660, 661 (Fla.1988). If "the time interval between the event and the statement is long enough to permit reflective thought, the statement will be excluded in the absence of some proof that the declarant did not in fact engage in a reflective thought process." Id. at 662 (quoting Edward W. Clearly, McCormick on Evidence, § 297 at 856 (3d ed.1984)); see also Rogers v. State, 660 So.2d 237, 240 (Fla.1995). The issue of "[w]hether the necessary state of mind is present is a preliminary fact for the court to determine pursuant to Section 90.104." Jano, 524 So.2d at 661 (quoting Charles W. Ehrhardt, Florida Evidence § 803.2 (2d ed.1984)); see also Young v. State, 742 So.2d 418, 419 n. 1 (Fla. 5th DCA 1999), review denied, 751 So.2d 1255 (Fla. 2000).
At trial, the State never asserted that Julie Stoll's statements were excited utterances, nor did the trial court ever make a factual finding to support this assertion. Moreover, we cannot make this determination independently based upon the record before us. Although Julie Stoll may have made the statements while she was under the stress of excitement caused by her fight with Stoll, the State did not make a sufficient showing of the time period between the event and the statement, nor did the State show whether the time period was such that Julie Stoll did not have time for reflective thought. Accordingly, we reject the State's argument that Julie Stoll's statements to Dana Martin *874 were admissible as excited utterances where the proper predicate was not established by the State and where such a finding was not made by the trial court.
Similarly, we reject the State's argument that Martin's statement, in whole or in part, was admissible under the state-of-mind exception to the hearsay rule, section 90.803(3).[6] First, the portion of Martin's testimony that Julie Stoll told Martin that Stoll "had threatened to kill her more than once" is hearsay within hearsay. In other words, Martin testified to what Julie Stoll told her that Michael Stoll had stated. This part of Martin's testimony is clearly inadmissible because no exceptions to the hearsay rule apply. See Hill v. State, 549 So.2d 179, 181 (Fla.1989) (finding that where testimony combines two hearsay statements, the testimony is considered hearsay within hearsay and inadmissible unless both statements conform to a hearsay exception).
The remainder of the statement allegedly made by Julie Stoll to Martin concerning her fears that her husband was going to kill her are solely expressions of Julie Stoll's state of mind. In particular, Martin testified: "Julie made me promise her ... that if anything happened to her [Julie Stoll] I would go to the police and tell them that Michael did it or had done it." She also testified that Stoll had threatened to kill Julie Stoll and that Julie Stoll "knew he would do it" and that Julie was "afraid that [Stoll] was going to kill her."
The victim's hearsay statements in a homicide case that the victim was afraid of the defendant generally are not admissible under the state of mind exception because the victim's state of mind is not a material issue in a murder case. See Peterka v. State, 640 So.2d 59, 69 (Fla. 1994). As we recently stated in Woods v. State, 733 So.2d 980, 987 (Fla.1999), "[A] homicide victim's state of mind prior to the fatal event generally is neither at issue nor probative of any material issue raised in the murder prosecution." Likewise, a victim's statements cannot be used to prove the defendant's state of mind. See Downs v. State, 574 So.2d 1095, 1098 (Fla.1991).
There are, however, certain circumstances where the victim-declarant's state of mind may become an issue in the case. First, the state of mind of the victim-declarant may be relevant to an element of the crime. In Peede v. State, 474 So.2d 808, 816 (Fla.1985), for example, the defendant was charged with kidnapping and it was necessary for the State to prove that the victim had been forcibly abducted against her will. We held that the trial court did not abuse its discretion in admitting the victim's statements to her daughter just prior to her disappearance because they demonstrated "the declarant's state of mind at that time was not to voluntarily accompany the defendant outside of Miami or to North Carolina." Id.
We have also found that the victim's state of mind may become relevant to an issue in the case where the defendant claims: (1) self-defense; (2) that the victim *875 committed suicide; or (3) that the death was accidental. See Woods, 733 So.2d at 987-88. In addition, the state of mind of the victim may become an issue to rebut a defense raised by the defendant. See State v. Bradford, 658 So.2d 572, 574-75 (Fla. 5th DCA 1995). In Bradford, the Fifth District held that the victim's statements of fear of the defendant may become admissible to "rebut the defendant's theory that the victim willingly let him inside her car and that is how his fingerprint got in her car." Id. at 575. The court added, however, that "[i]f the defendant does not put forth the theory that the victim willingly let him in her car, then her state of mind would not be at issue." Id.
In this case, Stoll did not raise a claim of self-defense, suicide, or accidental death. Nonetheless, the State maintains that Martin's testimony was relevant to rebut: (1) Stoll's trial testimony that he thought he had a happy marriage until just days before Julie Stoll's death; (2) Stoll's claim in his first taped statement that the May 1994 battery was the only incident he and Julie Stoll ever had; (3) Stoll's claim in his first taped statement that Julie Stoll was afraid of him because of the abuse she had received from her ex-husband; (4) Stoll's claim in his first taped statement that the reason Julie Stoll wanted a divorce was because she had a brain tumor and wanted to get away from everybody; (5) Stoll's claim in his second taped statement that he had been trying to work things out with Julie Stoll to get divorced "admirably"; and (6) Stoll's claim that someone else committed the murder.
Notably, four of these statements that the State claims Martin's testimony would rebut were introduced at trial via the taped statements the State submitted in its case-in-chief. However, the State may not introduce rebuttal evidence to explain or contradict evidence that the State itself offered. Cf. Brown v. State, 524 So.2d 730, 731 (Fla. 4th DCA 1988) (where the issue of an alibi defense was raised by the State, the State's reference to the defendant's failure to call alibi witnesses was prejudicial error). Thus, the only statements that the State could properly seek to rebut or impeach were those introduced by Stoll, Cf. Consalvo v. State, 697 So.2d 805, 814-15 (Fla.1996) (testimony elicited on cross-examination and requested pretrial "effectively opened the door to prosecutorial comment on suicide since the testimony elicited by defense counsel on cross-examination suggested a possible suicide defense").
Martin's statements regarding Julie Stoll's state of mind, however, do not rebut what Stoll thought about his marriage, nor do they properly impeach his statement that someone else committed the murder. First, the State's theory was that someone elseChris Stewartcommitted the murder, but that it was at Stoll's direction. Second, admitting Martin's otherwise inadmissible statement regarding Julie Stoll's state of mind to impeach Stoll's contention that someone else committed the murder would contradict our pronouncements in Woods, 733 So.2d at 987, Peterka, 640 So.2d at 69, and Downs, 574 So.2d at 1098, that a victim's state of mind is generally not a material issue in a murder case, except under very limited circumstances. See, e.g., Peede, 474 So.2d at 816. Accordingly, we reject the State's argument that the victim's state-of-mind statements should have been admissible under the state of mind exception to the hearsay rule, as rebuttal evidence, or to impeach Stoll. Because Martin's testimony concerning what Julie Stoll told her is hearsay and not otherwise admissible under any exception to that rule, we conclude that the trial court erred by permitting the State to call Martin as a rebuttal witness.

JULIE STOLL'S HANDWRITTEN STATEMENT
We next consider the error in admitting Julie Stoll's handwritten statement from a prior domestic violence case that Julie Stoll caused to be filed against Stoll. As *876 redacted by the trial court, Julie Stoll's statement was written as follows:
Michael Stoll physically hit me ... [and] verbally abused my son [and] myself. I am very fearful of my life and my children's lives. Michael Stoll has a 357[and] I fear he may use it on me or my children. I have no other place to go but I was informed that the boys [and] I were to be out of his house. (We) The boys [and] I have resided here for 2 yrs. I was physically abused with Michael's fists [and] the phone. I proceeded to call his mother while he was in the house [and] he denied the fact that he was wrong about the conversation. He hung up on his mother, because he was hitting me [and] didn't want her to know. His mother Linda called back [and] I let her go when the police arrived. I am not physically able or mentally able to deal with the stress.... I have MS [and] I am physically disabled but Michael insists on hitting me in the head and face. I would like for this to be taken care of because I am afraid and fear for my life [and] my boys' lives.
Before trial, the State filed a motion for judicial notice of the prior domestic violence case. Defense counsel objected based upon hearsay, but the court granted the State's request for judicial notice. Then, during the direct examination of Julie Stoll's mother, the State sought to introduce this handwritten report. After noting that it had already taken judicial notice of the document, the court explained that Julie Stoll's mother could either read the document, or the State could have it published to the jury. Defense counsel objected, arguing that there was "[n]o predicate" and that it was "inflammatory." The court then determined that because it had previously taken judicial notice of the document, there was no need to have somebody read it again, and therefore, it should be published to the jury. Defense counsel raised no further objection.
Stoll contends on appeal that Julie Stoll's handwritten statement was inadmissible hearsay, but the State asserts that this issue was not properly preserved for appellate review. However, the objection to the hearsay statement was properly made at the time that the trial court made its determination to grant the State's motion for judicial notice and allow the handwritten statement as part of the court's records. Accordingly, we find that defense counsel's hearsay objection to the motion for judicial notice was sufficient to preserve this issue for appellate review.
Having concluded that this issue was properly preserved, we turn to the merits of the issue. Clearly, Julie Stoll's handwritten statement is hearsay because it "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." § 90.801(1)(c), Fla. Stat. (1997); see Woods, 733 So.2d at 987; cf. Bolin v. State, 736 So.2d 1160, 1167 (Fla.1999) (finding that police reports are hearsay); § 90.803, Fla. Stat. (1997). Moreover, the hearsay statement was not subjected to cross-examination, and it falls under no recognized exception to the hearsay rule.
The only asserted basis for the admission of the hearsay statement was judicial notice. Although a trial court may take judicial notice of court records, see § 90.202(6), Fla. Stat. (1997), it does not follow that this provision permits the wholesale admission of all hearsay statements contained within those court records. We have never held that such otherwise inadmissible documents are automatically admissible just because they were included in a judicially noticed court file. Cf. Allstate Ins. Co. v. Greyhound Rent-A-Car, 586 So.2d 482, 483 (Fla. 4th DCA 1991) ("[T]he fact that the deposition may be judicially noticed does not render all that is in it admissible."); Milton v. State, 429 So.2d 804, 805 (Fla. 4th DCA 1983) (although the court file was judicially noticed, the trial court erred by permitting use of information *877 contained in that court file where the admission constituted a discovery violation and an inappropriate surprise). To the contrary, we find that documents contained in a court file, even if that entire court file is judicially noticed, are still subject to the same rules of evidence to which all evidence must adhere.
As recently observed by the New York Supreme Court, Appellate Division, in Ptasznik v. Schultz, 247 A.D.2d 197, 679 N.Y.S.2d 665, 666 (1998), there has been a "seemingly widespread but mistaken notion that an item is judicially noticeable merely because it is part of the `court file.'" (Citations omitted.) In Ptasznik, the issue was whether an affidavit that had been in the court's file was improperly given to the jury. In its discussion of the affidavit, the court explained that "[c]ourt files are often replete with letters, affidavits, legal briefs, privileged or confidential data, in camera materials, fingerprint records, probation reports, as well as depositions that may contain unredacted gossip and all manner of hearsay and opinion." Id. at 667. Nonetheless, the Ptasznik court cautioned that none of these documents are rendered admissible merely because they are part of the court file. See id.
We agree with the Ptasznik court's reasoning. Indeed, just as Julie Stoll's statement would not have been admissible in the underlying prosecution for domestic violence based solely on the fact that the statement was part of the court records, we likewise find that in this case, Julie Stoll's handwritten statement was not admissible because it had been judicially noticed. Because no other exception to the hearsay rule was established in this case, the admission of this statement into evidence was error.[7] Further, even if the handwritten statement qualified under an exception to the hearsay rule, the statement was improperly admitted in the State's case and would not have been proper rebuttal evidence for the same reasons we discussed regarding Dana Martin's testimony.

CUMULATIVE ANALYSIS
Having found two evidentiary errors which were properly preserved in the trial courtthe admission of Dana Martin's testimony regarding Julie Stoll's statements and Julie Stoll's handwritten prior statementwe now turn to the question of whether these errors were harmless beyond a reasonable doubt. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986).
In determining whether the errors described above were harmless, we initially note that the main witness in the case was Stewart, who admitted to performing the actual killing and who gave his testimony in exchange for a plea agreement to second-degree murder with a sentence of fifty years.[8] Further, Julie Stoll's statements to Martin and her handwritten statement prejudiced Stoll because they injected into the trial not only Julie Stoll's fears for herself, but also her fears for her children. *878 These statements were highly inflammatory. For example, the jury learned through this handwritten statement that Stoll had "physically hit" Julie Stoll; verbally abused her son and herself; and caused her to fear for her life and her children's lives. The handwritten statement also revealed that Stoll had a gun that Julie Stoll feared he would use on her or her children.
The prejudice Stoll suffered as a result of this evidence being improperly admitted was exacerbated by the State's reliance on this evidence during closing arguments. Indeed, the State's closing argument highlights how the State utilized and interwove both Julie Stoll's hearsay statements to Martin and her handwritten statement into significant corroborating evidence of guilt:
[Michael Stoll] knew that there was only one witness. And who can testify that I was struck by my husband? Julie Stoll can testify to that, no one else can testify to that....
Now, of course, there can never be a case, the main witness is gone. And what did she say? You know, her statement is in evidence. And you'll have a copy of that. I think you've already seen it. Twice on this statement, what does Julie Stoll say? ... I'm hereby stating Michael Stoll physically hit me and verbally abused me. Then she says, I am very fearful of my life....
And ... I would like toI would like for this to be taken because I am afraid and in fear of my life. She mentions it twice in this statement. She mentions it twice.
She also says something very, very revealing in here, and you'll, of course, you'll have a chance to read it. And this is germane to Mr. Edmund's cross-examination of Dana Martin. You recall Dana Martin's testimony. She says, I have no other place to go. She says that in here.
. . . .
We all hear a lot about battered women, we all read these newspaper articles. And both Dana Martin and Julie Stoll, in her statement, tell you the reason why she didn't get up and leave. Rightly or wrongly, correctly or incorrectly, she believed that she had no other place to go. And that is why she stayed there.
Dana Martin was also a very, very interesting witness and very compelling witness. Because she corroborates Julie Stoll's statement, which we now get, in effect, from beyond the grave. How does she corroborate it? Julie Stoll says here twice in this statement which is in evidence that she was in fear for her life. And what did Dana Martin tell you? Dana Martin told you some months before she was murdered, Julie extracted a promise from her, and that's why she made herself known to the police, and that's why she was able to come and testify in court.
What was the promise? The promise was, if you ever hear that I'm dead, tell the authorities that Michael Stoll did it, or had it done. And Dana Martin took that promise to her, and when she heard on November 3rd, 1994, that Julie was dead, that's exactly what she did. She felt she had to fulfill that promise and she ran to the authorities and let them know.... Julie was in fear for her life.
And you'll notice ... I might mention, when Dana Martin made that promise, that's before Christopher Stewart was living there the second time. That's before Christopher Stewart was there.... She did not express any fears of Chris Stewart. She said to Dana Martin, tell the authorities if I'm found dead that my husband did it, Michael Stoll, or had it done, not Chris Stewart.
(Emphasis supplied.)
As the foregoing clearly reveals, by introducing the inadmissible hearsay statements allegedly made by Julie Stoll to Martin, as well as Julie Stoll's handwritten statement from the court record of a prior proceeding, the State was provided with an *879 additional and powerful witness who could neither be impeached nor cross-examinedJulie Stoll. Based on this fact, along with consideration of the other evidence in this case, we conclude that the State has not demonstrated beyond a reasonable doubt that the errors "did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction." DiGuilio, 491 So.2d at 1135. Accordingly, we reverse Stoll's conviction and vacate the sentence imposed, and we remand this case for a new trial. Because we are reversing the conviction based on these errors, we do not address any of the other issues Stoll raises.
It is so ordered.
HARDING, C.J., and SHAW, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
WELLS, J., concurs with an opinion.
WELLS, J., concurring.
I concur that it was harmful error to have admitted into evidence witness Martin's statement as to the conversation between Martin and the victim in August 1994.
However, I do not agree that the handwritten statement by the victim which formed a part of the court file in the battery charge against appellant could not be admissible. It seems to me that this written statement meets the test of reliability which is fundamental to hearsay issues. I would allow this handwritten statement pursuant to section 90.804(2)(a), Florida Statutes. I believe the trial judge's reasoning was correct that this was a statement which passed the test of reliability within the boundaries of this exception to the hearsay rule. This statement was the foundation for the charge of battery against appellant. By entering a plea to the charge upon which the statement was based, the appellant short-circuited the process. But for the plea, appellant had the opportunity to cross-examine this statement. It is this opportunity to cross-examine which enhances the reliability of the statement.
I conclude that this kind of statement in a court file is precisely the kind of record which should overcome hearsay objections because it is enhanced in reliability because of the judicial proceeding in which the record exists. Clearly, the fact that the victim proceeded in court against appellant for domestic violence is a fact relevant to the jury's deliberation in this case. Domestic violence is often a pattern of conduct, and our rules of evidence should not be interpreted so as to prevent the jury from having before it the entire story.
NOTES
[1] Dr. Sashi Gore, the medical examiner, testified that "the probable cause of death was strangulation due to severe head and neck trauma."
[2] The trial court found the following two statutory aggravating factors: (1) the murder was heinous, atrocious, or cruel; and (2) the murder was cold, calculated, and premeditated.
[3] In mitigation, the trial court found the statutory mitigator of no significant prior criminal history (moderate weight); as well as the following nonstatutory mitigators: Stall's attendance at church with his daughter and attending sunrise Easter services on a steady basis (moderate weight); physical disability consisting of a cleft palate (little weight); and the facts that: (1) Stoll cared for Julie Stall's two sons and wanted to adopt at least her son Mikey; (2) he paid for her to go to Chicago for treatment for multiple sclerosis; and (3) he cared for her children while she was away (moderate weight).
[4] The four guilt phase issues are: (1) the trial court erred by permitting the State to call Dana Martin as a rebuttal witness; (2) the trial court erred by permitting the State to introduce a prior statement of a codefendant as substantive evidence of guilt; (3) the trial court erred in admitting an autopsy photograph; (4) the trial court erred by admitting a prior statement of the victim.
[5] The two penalty phase issues are: (1) the death sentence imposed upon Stoll was disproportionate as compared to the sentence imposed upon Stewart; and (2) the death sentence was improper because the court's findings regarding aggravating circumstances are in error.
[6] Section 90.803, Florida Statutes (1997), provides that the following are not inadmissible as evidence, even though the declarant is available as a witness:

(3) THEN-EXISTING MENTAL, EMOTIONAL, OR PHYSICAL CONDITION.
(a) A statement of the declarant's then existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
2. Prove or explain acts of subsequent conduct of the declarant.
(b) However, this subsection does not make admissible:
1. An after-the-fact statement of memory or belief to prove the fact remembered or believed, unless such statement relates to the execution, revocation, identification, or terms of the declarant's will.
2. A statement made under circumstances that indicate its lack of trustworthiness.
[7] Section 90.804(2)(a) (1997), cited by Justice Wells in his concurrence, provides for the following exception to the hearsay rule:

(a) Former testimony.Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered, or, in a civil action or proceeding, a predecessor in interest, had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination.
None of the predicates for this exception to the hearsay rule apply to the handwritten statement of Julie Stoll. Indeed, by its plain language, the exception requires that the hearsay be "[t]estimony given as a witness," and that it be given at a "hearing" or a "deposition taken in compliance with law." Id. Julie Stoll's handwritten statement, however, clearly is not "testimony, "and it was not given at a hearing, nor was it given at a deposition.
[8] At trial and on appeal, the State repeatedly referenced this agreement with Stewart as a situation in which it was "forced to `cut a deal with the devil.'"