GRIFFIN, J.
This appeal arises from a June 3, 2008, automobile accident in which a pick-up truck driven by Bernard Rubrecht [“Ru- *952 brecht”] was rear-ended by an SUV which, in turn, had been rear-ended by a Cone Distributing, Inc. [“Cone”] truck driven by Cone’s employee, Nicole Jean Radank [“Radank”]. Rubrecht, and his wife, Car-yn Rubrecht, appeal a final judgment which awarded Rubrecht $20,000 in damages, consisting of $15,000 in past medical expenses and $5,000 for future medical expenses. His wife took nothing.
After the verdict, Rubrecht filed a motion for an additur or, in the alternative, a motion for a new trial. He asserted that the damages awarded by the jury bore no relationship to the evidence presented during the trial, and requested that the trial court enter a verdict for past medical expenses in the amount of $414,554.92, and future medical expenses in the amount of $500,000. Alternatively, Rubrecht requested that the trial court grant a new trial on the issue of damages. On the same day, Rubrecht filed a motion for new trial, arguing that the verdict was against the manifest weight of the evidence. He also asserted that the trial court had erred by allowing the defense to impeach him using the contents of an offer of settlement letter his attorney had presented for an automobile accident that occurred approximately one month before the one at issue in the trial, and by publishing to the jury a portion of an appellate opinion in the divorce case of Rubrecht’s expert witness.
The trial court entered its order denying Rubrecht’s motions. As to the first evi-dentiary issue, the court concluded that it was proper to admit into evidence in the trial of the second rear-end collision the statements his attorney had made in offering to settle the first case. As for the second issue — publishing portions of the appellate opinion issued in the dissolution of marriage of Rubrecht’s expert witness — the court did not defend the ruling, but said that any error could not have been harmful. We conclude that both evi-dentiary rulings constitute reversible error.
The settlement issue arose because, approximately one month before the June 3, 2008, rear-end accident involving Cone, Rubrecht had been involved in another accident in which Rubreeht’s truck was rear-ended by another vehicle. The trial court allowed defense counsel to impeach Rubrecht by questioning him about statements made in a settlement offer letter that was written by his attorney with respect to the May accident. The at-fault driver in that case had insurance of only $10,000, and the settlement letter concluded by offering to settle for the $10,000 policy limits. The following exchange about the settlement took place during Rubrecht’s cross-examination:
Q. Good morning, Mr. Rubrecht.
A. Good morning.
Q. All right. I’ve got a little bit left and then we’ll wrap it up. We’ve heard testimony in this trial about the impact of the first accident and the second accident. I want to follow up a little bit on that.
A. Okay.
Q. Have you, sir, after the second accident, taken the position that, in fact, you would have future medical losses as a result of the first accident for the rest of your life at 3,000 dollars a year or 99,000 dollars, total?
A. Yes, sir, through my attorney.
Q. With respect to the first accident versus the second accident, have you, sir, taken the position that it is certain that your injuries from the first accident and the necessary future medical treatment from that first accident would cause you to sustain substantial economic losses in the future?
A. Can you say that again, please?
*953 Q. Yeah. Did you take the position after the second accident—
A. Okay.
Q. Let me ask it this way. Did you take the following position after the second accident with respect to the first accident: That it is certain that your injuries and the necessary future medical treatment will cause you to sustain substantial economic losses in the future?
A. Yes, sir.
Q. Did you take the following position after the second accident with respect to the first accident: If your economic losses were based on a work life of 19 years at a minimum of four dollars an hour, your future wage losses would exceed 158,000 dollars as a result of the first accident?
A. Yes, sir.
Q. After the second accident, did you take the following position with respect to the first accident: As a result of the May accident, you will need to seek a new vocation, one where you are not driving many hours?
A. I’m not sure.
Q. After the second accident—
A. Okay.
Q. —but with respect to the first accident, did you take the following position: That the driving aggravates your neck and low back, and currently the reason why you are undergoing surgery with Dr. Nucci?
A. Yes.
Defense counsel did not offer the settlement letter in evidence, but each of the foregoing “positions” inquired about by defense counsel came verbatim from the offer of settlement letter.
On re-direct, Rubrecht testified in part that he was hurt in the first accident, that the second accident made him worse, that his medical bills had gone up as a result of the second accident, and that he presently was not able to work at all. When asked why the second accident made his condition “a lot worse,” Rubrecht explained:
I’m not a doctor, but I think the first accident helped me get worse from the second accident. You know what I mean? It was sort of intertwined.
If I wouldn’t have had the first accident, I wouldn’t have got as hurt as much as the second accident; but, you know, it’s a chicken and an egg kind of thing.
Rubrecht contends that the trial court, in allowing defense counsel to cross-examine him concerning statements made by his attorney in an effort to negotiate a settlement of his claim arising out of the first accident, violated section 90.408, Florida Statutes.
Section 90.408, Florida Statutes (2010),[1] provides:
Evidence of an offer to compromise a claim which was disputed as to validity or amount, as well as any relevant conduct or statements made in negotiations concerning a compromise, is inadmissible to prove liability or absence of liability for the claim or its value.
Appellees counter that their interrogation was not within the limitations of section 90.408 because the settlement negotiations in the first case did not involve the claim in the second case. Moreover, defense counsel did not introduce the demand letter into evidence and did not reference the settlement. They assert that, because Ru-breeht took the position in the settlement *954 demand letter for the first accident that his injuries and damages were caused by the first accident, but took the position during the trial of the second accident that his injuries and damages were either completely attributable to the second accident or, alternatively, could not be apportioned between the two accidents, it was proper for defense counsel to impeach Rubrecht with his prior inconsistent position.
We start with the proposition that, in Florida, “settlements or offers of settlement have never been considered admissions against interest binding on the parties making them.” Mortg. Guar. Ins. Corp. v. Stewart, 427 So.2d 776, 780 (Fla. 3d DCA 1983); see also Sullivan v. Galske, 917 So.2d 412, 414 (Fla. 2d DCA 2006) (“Because parties often make offers to settle for economic reasons, an offer is not treated like an admission of liability and would be of marginal relevance to the issues at trial. This evidence is also excluded to encourage settlement discussions”).
The first question is whether evidence of statements made during settlement negotiations is inadmissible to prove liability or the absence of liability or the value of a claim in the lawsuit other than the one in which the offer was made. In Rease v. Anheuser-Busch, Inc., 644 So.2d 1383, 1388 (Fla. 1st DCA 1994), the First District Court of Appeal discussed section 90.408, Florida Statutes, and said that “[a] fundamental premise for the application of this [statutory] rule is that the offer to compromise must relate to the claim disputed in the lawsuit.”
Here positions taken by Rubrecht’s counsel in negotiating settlement of the claim for the first accident are related to the claim at issue in this lawsuit because a key issue was whether Rubrecht’s claim for damages could be apportioned between the two accidents. When defense counsel was allowed to question Rubrecht about the statements by Rubrecht’s counsel, the purpose of which was to obtain the $10,000 policy limits settlement of the first accident, Rubrecht’s position in this case that his damages were attributable to the second accident, or that damages could not be apportioned between the two accidents, was directly affected. See generally City of Coral Gables v. Jordan, 186 So.2d 60, 62 (Fla. 3d DCA 1966).
Rubrecht relies upon Sea Cabin, Inc. v. Scott, Burk, Royce & Harris, P.A., 496 So.2d 163 (Fla. 4th DCA 1986), and Charles B. Pitts Real Estate, Inc. v. Hater, 602 So.2d 961 (Fla. 2d DCA 1992), for the proposition that section 90.408 is applicable to settlements with different parties if the claim is related. In Sea Cabin, the Fourth District Court of Appeal found that “it was error for the trial court to admit a letter from appellants’ counsel to another party suggesting that the other party was responsible for appellants’ damages and proposing a settlement of appellants’ claim against that party.” 496 So.2d at 164. It explained that “[i]n addition to the fact that the letter was not authored by appellants, Section 90.408, Florida Statutes (1983) bars the receipt into evidence of offers to compromise,” and that it “ha[d] ruled that this bar applies to settlement offers made to third parties as well as parties to the litigation.” Id.
In Hater, after a real estate sales transaction failed to close, the real estate brokers brought suit against the sellers based upon allegations that they were entitled to a $400,000 brokerage fee under the terms of the real estate sales contract. 602 So.2d at 962-63. Under the terms of the real estate sales contract, the brokers were to receive a $400,000 brokerage fee at the time of closing; however, in the event that the transaction did not close, the brokers would still receive the $400,000 if the failure to close was due to the sellers’ failure *955 to perform, but would only receive 50% of the deposit, $2,500, if the failure to close was due to the buyer’s failure to perform. Id. at 962. The case went to trial, and “[t]he jury determined that the transaction had not closed due to the failure of [the buyer] to perform and, accordingly, awarded the Brokers only $2,500.” Id. at 963.
On appeal, the brokers argued that the trial court had erred by prohibiting evidence of a settlement in a lawsuit between the sellers and buyer for specific performance of the real estate sales contract, wherein the parties stipulated to dismissal of the lawsuit, and the sellers paid the buyer “$540,000 for the settlement and received an assignment of the buyers’ rights, if any, under the agreement to sell.” Id. at 963. The Second District Court of Appeal found that the trial court did not abuse its discretion in prohibiting evidence of the settlement, explaining that “[although the settlement in the case between the [sellers] and [buyer] was not an offer or [of] settlement in [the case under review], it was a settlement of a closely related issue in the earlier case,” and that “[i]t [was] quite analogous to a settlement with a codefendant.” Id.
The Second District concluded that the brokers “ha[d] not demonstrated that the settlement had any probative value that was not substantially outweighed by the danger of unfair prejudice or confusion.” Id. It noted:
We have not overlooked the possibility that a settlement of this sort could “col- or” the testimony of the settling parties in the subsequent lawsuit and that the settlement might become admissible on an issue of credibility. In this case, the critical witnesses from [the buyer] had been deposed in at least one of the lawsuits before the settlement. One of the key witnesses from [the buyer] had given the Brokers a lengthy affidavit to support their motion for summary judgment in this case long before the settlement. Thus, the Brokers did not establish in the trial court that this settlement fit within any conceivable exception to the general rule against admissibility.

Id.

Appellees distinguish Sea Cabin because the letter offering to settle was admitted into evidence in that case, but, here, the demand letter offering to settle the claim for the first accident was not admitted into evidence. This is a distinction without a difference. Under section 90.408, in addition to evidence of an offer to settle, evidence of statements made during settlement negotiations is inadmissible to prove liability or the absence of liability or the value of a claim. See Benoit, Inc. v. Dist. Bd. of Trustees of St. Johns River Cmty. Coll. of Fla., 463 So.2d 1260, 1261 (Fla. 5th DCA 1984) (agreeing with Atwater v. Gulf Maintenance & Supply, 424 So.2d 135 (Fla. 1st DCA 1982), that “any part of a letter offering a settlement between the parties is barred by section 90.408;” “[t]he old common law rule was that statements of independent facts made in an offer to compromise were admissible;” “[t]his section alters the common law rule by giving greater protection to the offeror, thus furthering the public policy of this state which favors amicable settlement of disputes and avoidance of litigation” (footnotes omitted)).
Appellees contend that under Hater, evidence of Rubrecht’s prior positions was admissible as an exception to the general rule of inadmissibility because it was offered for purposes of impeaching Ru-brecht’s credibility. There is language in Hater that does suggest that evidence of a settlement might be admissible for purposes of impeaching a settling party’s testimony, but in Hater, the court appeared to reference a situation where a settlement *956 might include an agreement or other means to “color” a settling party’s case. This does not apply here. Here, Ru-brecht’s counsel’s task in attempting to settle the May 2, 2008, accident claim was to offer the most compelling case and the most persuasive argument why the insurer in the first suit ought to tender the $10,000 policy limits. That is precisely the kind of negotiation the statute is designed to protect. See Saleeby v. Rocky Elson Constr., 3 So.3d 1078, 1081-82 (Fla.2009), (trial court erred by admitting evidence that a previous defendant, a truss-manufacturing company, had settled out of the lawsuit where the basis for admission of the evidence was impeachment of the testimony of the President of the truss manufacturing company).
The purpose of the statute is to allow counsel to communicate freely in an effort to settle litigation without the risk that any statement made will be used against his clients. By their nature, such communications have limited probative value. Because the evidence of positions taken in negotiating settlement of the claim for the first accident suggested that Ru-brecht’s damages were largely attributable to the first accident, and because the issue of apportioning damages between the two accidents was disputed in this case, the positions taken by Rubrecht’s counsel in negotiating settlement of the claim for the first accident were inadmissible. The admission of evidence of the positions taken by Rubrecht’s counsel in negotiating settlement of the claim for the first accident was inherently and highly prejudicial with respect to the disputed issue of apportionment of damages between the two accidents. Its admission, therefore, constituted reversible error. See Saleeby, 3 So.3d at 1085.
We also agree with Rubrecht that the trial court reversibly erred by taking judicial notice of statements in Nucci v. Nucci, 987 So.2d 135 (Fla. 2d DCA 2008), in order to discredit his key witness, Dr. Robert Nucci, M.D.
Prior to the start of the trial, the trial court addressed Rubrecht’s motion in li-mine, which included a request to exclude any argument or testimony that Dr. Nucci had stated in his divorce action that a large percentage of his practice was based upon letters of protection. Prior to trial, Dr. Nucci’s video deposition had been taken. The following exchange occurred during the deposition, on cross-examination:
Q. Okay. Doctor, again, my name is Jeff Pearson. I represent the defendants. You accepted this case with a letter of protection, did you not?
A. That is true.
Q. Okay. And, realistically, you don’t get paid unless there’s a recovery connected with the letter of protection; is that correct?
[RUBRECHT’S COUNSEL]: Which I object to.
A. Well, I can’t really say on Mr. Ru-brecht. I mean, he’s, of course, responsible for his bills. I offered him the courtesy of not to ask him for payment until his legal matter is done, but I expect him to pay his bill, of course.
Q. Is it true that a hundred percent of your income comes from letters of protection?
[RUBRECHT’S COUNSEL]: Objection.
[DR. NUCCI’S COUNSEL]: I’m going to object as well.
[DEFENSE COUNSEL]: Okay.
A. Well, that’s not time.
Q. Okay. Have your firm — has your firm or has anyone on behalf of you *957 or anyone that you know added up your letters of protection in the last five years?
[DR. NUCCI’S COUNSEL]: I’m going to object, and I’m going to move for a protective order and — just so that maybe we cure this objection, sir, I would remind you that Dr. Nucci is a treater and not an expert.
[DEFENSE COUNSEL]: Okay. I’m not asking for an expert opinion on that. I think that question was straight forward.
[DR. NUCCI’S COUNSEL]: Okay. Well, impermissible discovery, and I’m instructing my client not to answer.
[DEFENSE COUNSEL]: Okay. We’ll certify that and take it up with the court.
Dr. Nucci’s deposition was read at trial. Prior to the close of evidence, the trial court heard lengthy argument from the parties regarding the issue of whether two sentences from the Second District Court of Appeal’s opinion in Dr. Nucci’s divorce case should be published to the jury. The sentences at issue were the following:
Dr. Nucci is a successful surgeon with a lucrative practice limited to patients involved in personal injury litigation. His fees are paid from the litigation proceeds pursuant to letters of protection from the patients’ personal injury attorneys.
Nucci, 987 So.2d at 136. Defense counsel conceded that he was at fault for not having filed a motion to compel Dr. Nucci’s testimony after he was instructed by his counsel not to answer questions on the topic of the letters of protection during his deposition. He informed the trial court that, in an effort to cure the defense’s oversight, the defense was requesting that the trial court take judicial notice of the statements in the Second District’s opinion.
Rubrecht’s counsel objected to publication of this passage to the jury. He argued that it was not competent evidence, lacked probative value and was not of any use as impeachment because it did not conflict with Dr. Nucci’s testimony. Defense counsel argued:
But to get to the heart of your argument, I think it goes to the weight, not the admissibility. And I do not intend to say “100 percent.” I intend to say precisely what’s in that opinion. I will probably have it in front of me to read it to make sure I don’t get it wrong.
But it gets down to the heart of what you’re talking about, which is this is not just a small percentage, but this is at least a significant percentage of his livelihood. And it just goes straight to bias. So my response is it goes to weight, not admissibility.
At the close of evidence, the trial court “took judicial notice” of the statements in the Nucci opinion as follows:
The Defendants have asked that I take judicial notice of a brief portion of a — of the following information out of an opinion from the Second District Court of Appeal called Nucci, N-u-c-c-i, v. Nucci. That’s Dr. Nucci you’ve heard about earlier.
Okay. This is a part of the opinion in the Nucci divorce case from the appellate court that reads as follows:
“Dr. Nucci is a successful surgeon with a lucrative practice limited to patients involved in personal injury litigation,” period. “His fees are paid from the litigation proceeds pursuant to letters of protection from the patients’ personal injury attorneys,” period. That’s the end of the judicial notice.
Immediately thereafter, the defense rested.
*958 As an initial matter, while the parties assert that the statements from the Nucci opinion were admitted for purposes of impeaching Dr. Nucci, the nature of the impeachment is unclear. The defendants appear to have wanted to use this language in Nucci’s divorce to impeach him on the subject of whether all (or 100%) of his income derived from letters of protection. Rubrecht is correct that it was not viable for such a purpose. The court, on the other hand, appeared to have allowed the statements from the Nucci opinion to show a motive why Dr. Nucci might falsely testify about the extent of injury and its causation, namely that his interest in getting paid through proceeds from litigation might have biased him to falsely give testimony favorable to Rubrecht.
In taking judicial notice of the statements in the Nucci opinion, the trial court did not say whether they were being admitted under section 90.201 or section 90.202, Florida Statutes, although, prior to reading from the Nucci opinion, while hearing argument from the parties, the trial court referenced section 90.201. Relying upon Dufour v. State, 69 So.3d 285 (Fla.2011) and BDO Seidman, LLP v. Banco Espirito Santo Int’l, 38 So.3d 874 (Fla. 3d DCA 2010), Rubrecht contends that the trial court erred by taking judicial notice of the statements in the Nucci opinion.
In Dufour, one of the issues addressed by the Florida Supreme Court was whether a postconviction court had erred by taking judicial notice of a “2002 postconviction proceeding and certain letters within the court file.” 69 So.3d at 253. The Court said that while a court may take judicial notice of court records under section 90.202(6), Florida Statutes, “the fact that a record may be judicially noticed does not render all that is in the record admissible.” Id. It further provided:
Thus, while the court may take judicial notice of documents in a court file that were properly placed there, this notice would not make the contents of the documents admissible if they were subject to challenge, such as when a document is protected by privilege or constituted hearsay. In addition, taking judicial notice of an entire prior proceeding may be expeditious for the current proceedings, but it does not allow the substance of the underlying materials to be entered into evidence without compliance with the rules of evidence.
Id. at 254.
In BDO Seidman, the Third District Court of Appeal found that a “bankruptcy order was not a proper subject of judicial notice, nor properly admissible evidence” where “[t]he trial court [had taken] the view that the facts determined by the bankruptcy court were properly admissible in [the] case.” 38 So.3d at 880. In reaching its finding, the Third District explained:
“Inadmissible evidence does not become admissible because it is included in a judicially noticed court file.” The Florida Bar, Evidence in Florida § 2.12, at 2-7 (7th ed. 2008). “Although a trial court may take judicial notice of court records, it does not follow that this provision permits the wholesale admission of all hearsay statements contained within those court records.” Stoll v. State, 762 So.2d 870, 876 (Fla.2000) (citation omitted). “[T]here has been a ‘seemingly widespread but mistaken notion that an item is judicially noticeable merely because it is part of the “court file.” ’ ” Id. at 877 (citation omitted).
“A court judgment is hearsay ‘to the extent that it is offered to prove the truth of the matters asserted in the judgment.’ ” United States v. Sine, 493 F.3d 1021, 1036 (9th Cir.2007) (citation *959 omitted). As to those matters, there must be an applicable hearsay exception. Stoll, 762 So.2d at 876; § 90.805 (2009); see also Charles W. Ehrhardt, Ehrhardt’s Florida Evidence § 204.2, at 85 & n. 5 (2009).
Under the Evidence Code, a request for judicial notice is also subject to analysis under section 90.408, Florida Statutes. See § 90.204, Fla. Stat. “[judicial findings of fact ‘present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.’ ” Nipper v. Snipes, 7 F.3d 415, 418 (4th Cir.1993); see also Secada v. Weinstein, 563 So.2d 172, 173-74 (Fla. 3d DCA 1990)....

Id.

Although the Appellees correctly point out that “[njeither case addresses a trial court’s decision to take judicial notice of a portion of an appellate opinion,” we think the many reasons why this excerpt from the Nucci divorce ease is inadmissible in this case should be obvious. Hearsay is the basic reason. An appellate opinion is a writing by a judge that derives its substance from many sources. A statement made in the opinion may be true only as far as evidence appears in that case; it may be an interpretation of evidence. A statement made in an appellate opinion cannot substitute for proof of the fact.
In the order denying the motion for new trial below, the trial judge himself did not defend publication of the opinion to the jury, but merely remarked that it could not have been harmful to Rubrecht’s case. On appeal, Appellees have adopted a similar approach. Dr. Nucci’s testimony was critical to the plaintiffs ease, however, and any evidence purporting to impugn his credibility or demonstrate bias was harmful. No doubt that was the very reason defense counsel labored so intently to convince the judge to admit it. The effect of the passage was enhanced precisely because it was the publication of a judicial opinion of an appellate court. The timing and manner of its presentation to the jury as a sort of ex cathedra pronouncement at the close of evidence gave emphasis to something entirely lacking in evidentiary value. The recitation of a statement made in an appellate opinion in one case cannot substitute for the presentation of evidence in another case. Under whatever standard for harmless error may prevail in Florida,[2] we cannot say this error was harmless. Appellant is entitled to a new trial.
REVERSED and REMANDED.
PALMER and TORPY, JJ., concur.

. Section 90.408, Florida Statutes, was enacted in 1976. Ch. 76-237, § 1, at 562, Laws of Fla.

. See generally Special v. Baux, 79 So.3d 755 (Fla. 4th DCA 2011).