549 So.2d 1061 (1989)
Toni COURTNEY, As Personal Representative of the Estate of Phillip Courtney, Deceased, Appellant,
v.
FLORIDA TRANSFORMER, INC., a Florida Corporation and Choctawhatchee Electric Cooperative, Inc., a Florida Corporation, Appellees.
No. 88-2068.
District Court of Appeal of Florida, First District.
September 13, 1989.
Stanley Bruce Powell of Powell, Jones & Reid, Niceville, for appellant.
John N. Boggs, Panama City, for appellees.
JOANOS, Judge.
This is an appeal from a final summary judgment dismissing employees of Choctawhatchee *1062 Electric Cooperative, Inc. (CHELCO) as co-defendants in a wrongful death action filed by Toni Courtney, wife of decedent Phillip Courtney. The single issue raised in this appeal concerns the propriety of the grant of summary judgment in favor of co-employees of the decedent. We reverse.
On March 11, 1986, appellant filed a complaint for damages against Florida Transformer, Inc., for the wrongful death of her husband, Phillip Courtney. Florida Transformer filed an answer, affirmative defenses, and a third party complaint against CHELCO. CHELCO filed its answer, motion to dismiss, and notice of payment of workers' compensation benefits. On October 27, 1986, CHELCO's motion to dismiss was granted.[1] The complaint was subsequently amended to include CHELCO employees Jackson, Hobbs, Gainey, Adams, and Bell, as defendants. On July 14, 1987, the individual defendants filed a motion for summary judgment, on the ground that their conduct did not rise to the level of gross negligence required for liability under the provisions of section 440.11, Florida Statutes.
The circumstances which led to Phillip Courtney's death and the lawsuit which is the subject of this appeal occurred on Monday, January 6, 1986, when a six man line crew, consisting of lineman Jackson, apprentice lineman Hobbs, winch truck operators Adams and Caswell, and groundmen Gainey and Courtney, was dispatched by CHELCO to replace a broken utility pole. The pole carried overhead power lines with 7,200 volts of electricity. The broken pole had been discovered on Friday night at which time it was stubbed, rather than replaced, due to wet, boggy conditions in the area around it. The crew supervisor was in a management meeting, and did not accompany the crew to the work site on the morning of the fatal injury. According to the testimony of CHELCO's director of operations, lineman Jackson was in charge on January 6, 1986. However, one of the winch truck operators stated that no one was in charge. Mr. Caswell, senior member of the crew in terms of years with CHELCO, said that it was not unusual for the crew to go on a job without a supervisor. Failure to have a supervisor present is a violation of the National Electrical Safety Code (NESC).
When the crew arrived at the job site, the area around the broken pole was still wet and boggy. After surveying the scene, the crew concluded that they would be unable to get a heavy bucket truck close enough to the pole, so they decided to replace the pole with a light winch truck. Because the insulated bucket truck could not be used, the crew also decided the line should be de-energized. After obtaining clearance to de-energize the three phase line, the crew then decided that with the line de-energized, they could save time and restore customer service sooner, by putting all the materials on the pole before setting it in the lines. They also decided that ground lines should be attached, and laid the lines out ready to be applied.
The breaker switches for de-energizing the lines were located some two to four miles from the work site. Before Caswell left the pole area to throw the breaker switches, he told the crew to put the grounds on the line. After Caswell opened the breakers on the three phase line, he called the crew at the pole by radio to advise that the breakers were open, and again told the crew to ground the lines.
Adams was operating the winch truck, which had been grounded. When the crew received the message that the breakers were open, Adams proceeded to set the pole. Adams gave his rubber gloves to Courtney, who was guiding the pole as Adams raised it with the winch. As the winch truck operator worked the new pole with its cross-arm up through the three phase lines, the pole brushed a line that was still energized, and electricity flowed through Courtney's body.
*1063 Caswell was still at the breakers when Courtney was injured. Jackson called Caswell, and asked if the line was dead. Caswell responded that the breakers were open, and Jackson advised him that a man had been injured. When Caswell arrived at the scene, Adams and Hobbs were performing cardiopulmonary resuscitation on Courtney. At that point, Caswell did not check to see if the lines had been grounded. He said he had given instructions to ground the lines because it is common practice, and is required by the safety manual.
Caswell's testimony concerning grounding the lines was corroborated by the depositions of the other employees. In addition, Hobbs testified that it is normal procedure to ground before work is undertaken, and he could offer no reason for the crew's failure to do so in this instance. Gainey said the crew discussed placing the grounds, but decided to place them after the pole was set, because they thought the line would be dead. Lineman Jackson said that although normally the crew would ground the lines, they had worked without grounding on other occasions. Jackson also testified that failure to ground the lines was a violation of a company safety rule. He concluded that if the grounds had been attached, there would have been no electrical flow through the line. Jackson conceded that the crew always grounded lines before working on them when a supervisor was on the scene. Jackson further stated that he had never before worked on a job in which breakers were opened manually, as they had been in this case, and then found the lines had not opened properly so that current still flowed through.
CHELCO operations manager Bell stated that it is a cardinal rule that work crews are always supposed to consider that a line is "hot" unless they have visual verification to the contrary. When Bell arrived at the scene, he observed that everything had been assembled to ground the lines, which indicated that the crew intended to ground the lines after the pole was set. He said that although the procedure followed by the work crew in this case was not preferred, such practice was followed approximately ten per cent of the time. The preferred method is to ground the lines before any other work is begun. According to Bell, the grounds could have been placed in this case by going to an adjacent pole or by moving a bucket truck under the line.
The statement of the registered engineer who reviewed the record on appellant's behalf characterized the conduct of the CHELCO employees as "gross negligence and conscious and wanton disregard of the most fundamental applicable safety rules." In the opinion of this engineer, the gross negligence of the defendant employees resulted in Courtney's electrocution. He further stated that the deposition testimony of the employees demonstrated an intentional and deliberate failure to verify that the overhead distribution lines were actually energized and properly grounded prior to proceeding with the broken pole replacement, and that such failure was a violation of the National Electrical Safety Code Rules and CHELCO Safety Rules.
CHELCO's workers' compensation carrier retained a professional engineer to conduct an in-house investigation concerning the events that resulted in Courtney's death. He testified that he found that the utility and the crew members working for the utility do not follow many of the guidelines established by the National Electrical Safety Code. He also determined that an oil reclosure which was connected to the circuit did not function properly, and therefore did not interrupt current flow as it was expected to do. He noted that the NESC specifies that an employer designate a person to be in charge of the crew, and that such person is charged with the responsibility to see that crew members follow safety guidelines. According to this engineer's testimony, his investigation indicated the employees worked on the assumption that the line was de-energized. In his opinion, it was probable the accident would not have occurred if proper safety procedures, including those outlined in the NESC, had been followed. He described the crew's failure to put grounds on the lines as a clear violation of safety practices, noting that grounding de-energized lines is *1064 fundamental. Further violations occurred in failing to test the lines to determine they were de-energized, and in attaching cross arms and hardware to the pole before raising it, which made it more difficult to manipulate the pole up between the phases.
A third registered professional engineer testified that the crew's failure to place protective grounds on the lines was a simple violation of the work rule, which he termed an act of "simple negligence." He concluded that the employees had not knowingly or deliberately violated the safety rules. When asked to explain his position in view of lineman Jackson's contrary testimony, he maintained that as the acting superintendent, Jackson was allowed to waive certain rules.
Following the hearing on the employees' motion for summary judgment, the trial court entered an order finding that the circumstances of the case did not rise to the level of gross negligence or willful and wanton misconduct that would remove the co-employees from the section 440.11(1) immunity from liability. Thereafter, final judgment was entered in favor of the employees.
Resolution of this case turns upon whether the conduct of Courtney's fellow employees can be determined to constitute gross negligence. The applicable statute, section 440.11(1), Florida Statutes (1985), states in pertinent part:
The liability of an employer prescribed in s. 440.10 shall be exclusive and in place of all other liability of such employer ... to the employee, the legal representative thereof, next of kin, and anyone otherwise entitled to recover damages from such employer ... on account of such injury or death. .. . The same immunities from liability enjoyed by an employer shall extend as well to each employee of the employer when such employee is acting in furtherance of the employer's business and the injured employee is entitled to receive benefits under this chapter. Such fellow-employee immunities shall not be applicable to an employee who acts, with respect to a fellow employee, with willful and wanton disregard or unprovoked physical aggression or with gross negligence when such acts result in injury or death or such acts proximately cause such injury or death,... (emphasis supplied).
In Carraway v. Revell, 116 So.2d 16 (Fla. 1959), the court articulated a rule designed to clarify the distinction between simple and gross negligence. There the court stated:
We think the rule which would more nearly solve the problem than any other would be one that recognized that simple negligence is that course of conduct which a reasonable and prudent man knew might possibly result in injury to persons or property whereas gross negligence is that course of conduct which a reasonable and prudent man would know would probably and most likely result in injury to persons or property. To put it another way, if the course of conduct is such that the likelihood of injury to other persons or property is known by the actor to be imminent or `clear and present' that negligence is gross, whereas other negligence would be simple negligence.
116 So.2d at 22-23. The rule received a more detailed explication in Glaab v. Caudill, 236 So.2d 180 (Fla. 2d DCA 1970):
First ... gross negligence presupposes the existence of a "composite" of circumstances which, together, constitute an "imminent" or "clear and present" danger amounting to more than normal and usual ... peril.
.....
Secondly, gross negligence must be predicated on a showing of chargeable knowledge or awareness of the imminent danger spoken of.
... thirdly, the act or omission complained of must occur in a manner which evinces a "conscious disregard of consequences", as distinguished from a "careless" disregard thereof (as in simple negligence) or from the more extreme "wilful or wanton" disregard thereof (as in culpable or criminal negligence). Stated another way, given chargeable awareness as aforesaid, we equate "conscious disregard of consequences" with a voluntary *1065 act or omission in the face of conditions toward which reasonable prudence requires a particularly keen alertness or caution when such act or omission is dangerous and well-calculated to result in grave injury... . the "probable and most likely" test, as affirmed in Carraway v. Revell, supra, does not contemplate mathematical probability in the sense that an accident or injury is more likely to occur than not.
236 So.2d at 183-185. Accord Weller v. Reitz, 419 So.2d 739 (Fla. 5th DCA 1982).
In Sullivan v. Streeter, 485 So.2d 893 (Fla. 4th DCA 1986), approved, 509 So.2d 268 (Fla. 1987), the rule was applied in the workers' compensation context. There, the court said:
In order to state a cause of action for gross negligence ..., as permitted by the exception to Section 440.11, Florida Statutes, the ... [complaint] ... must allege ultimate acts which show: (1) a composite of circumstances which, together constitute a clear and present danger; (2) an awareness of such danger and (3) a conscious, voluntary act or omission in the face thereof which is likely to result in injury.
485 So.2d at 895.
It is well settled that when ruling on a motion for summary judgment, courts must construe the facts in a light most favorable to the non-moving party. Foy v. Fleming, 168 So.2d 177, 178 (Fla. 1st DCA 1964). See also Brock v. G.D. Searle & Co., 530 So.2d 428, 431 (Fla. 1st DCA 1988). In addition, where the line separating simple and gross negligence is doubtful or indistinct, "the question of whether the negligence is ordinary or gross is one which should be submitted to the jury." Foy v. Fleming, 168 So.2d at 179, citing Carraway v. Revell, 116 So.2d 16 (Fla. 1959).
After viewing the facts and circumstances of the instant case with reference to the enumerated factors determined to constitute gross negligence, we conclude the case falls into that doubtful, indistinct realm in which the question of whether the negligence is ordinary or gross should be submitted to the jury. Foy v. Fleming, 168 So.2d at 179. First, it is undisputed that activity involving 7,200 volts of electricity constitutes a clear and present danger. Second, the record reflects that the members of the work crew were cognizant of the amount of voltage flowing through the lines. The record also reflects that each member of the work crew recognized that failure to ground the lines before undertaking the pole replacement was a fundamental safety violation. Furthermore, the members of the work crew acknowledged that they had been trained to assume that power lines are energized unless the contrary has been made manifest, yet proceeded in this case on the assumption that the lines were de-energized. Similarly, the members of the work crew recognized that the decision to attach the crossarms and hardware to the pole before raising it not only enhanced the difficulty of placing the pole, but also enhanced the risk of an electric charge from the capacitors, even if all three lines in fact had been de-energized. Third, the record reflects that the failure to follow standard safety practices in this case was conscious, voluntary, and with full awareness of the danger involved.
Were it not for evidence that the procedure adopted in this case had been followed on a few other occasions by CHELCO employees, we would be inclined to characterize the work crew's knowing and voluntary violation of fundamental safety rules as facially sufficient evidence of gross negligence. However, the fact that such conduct had occurred on prior occasions, without fatal consequences, creates an element of doubt concerning the employees' knowledge of the likelihood of imminent injury.[2]
The trial court, in the order on motion for summary judgment, made six findings of purportedly undisputed facts which formed the basis for the court's conclusion that the circumstances of the case do not rise to the level of gross negligence. Of those six findings, only three are clearly undisputed, *1066 i.e., (1) the employees did not ground the line before proceeding with the pole replacement, (2) one employee gave the victim his rubber gloves, and (3) the boom truck was grounded. However, the record does not establish the purportedly undisputed nature of the other facts. For example, the safety precaution of de-energizing the line could not be termed "ultimate," since the de-energizing was not verified; arguably, Jackson, the senior lineman, was performing as supervisor; and the finding that the pole to be replaced was unsafe for climbing cannot be found in the deposition of any employee. Although this latter finding was inferred by the employees' expert witness, it was negated by the testimony of Bell, CHELCO's operation manager, who testified that the lines could have been grounded by going up the poles on either side of the broken pole.
We find that in the circumstances of this case, the question concerning the nature of the individual employees' negligence, i.e., whether "simple" or "gross," is doubtful and indistinct. Accordingly, the final summary judgment in favor of the individual employees is reversed, and the cause is remanded for proceedings consistent with this opinion.
SHIVERS, C.J., and ERVIN, J., concur.
NOTES
[1] The exclusivity provisions of the Workers' Compensation Act immunize an employer from any other liability to an employee injured in the course of his employment. § 440.11(1), Fla. Stat. (1985); Brown v. Winn-Dixie Montgomery, Inc., 469 So.2d 155 (Fla. 1st DCA 1985).
[2] In so concluding, we are mindful that other CHELCO employees have been injured on the job, albeit not fatally.