SALTER, J.
 

 The accounting firm of BDO Seidman, LLP appeals a jury verdict and final judgment awarding the appellees over $159 million in compensatory damages and over $351 million in punitive damages. The appellees — Banco Espirito Santo and two of its affiliates (collectively, “Banco”)— cross-appeal the denial of prejudgment interest on the compensatory award from the date the losses allegedly occurred through the date of the jury verdict. We reverse the final judgment and remand the case for a new trial, finding that the “trifurcation” of the trial into three distinct phases impermissibly allowed the jury to render a verdict on BDO’s liability for gross negligence (a determination pertinent in this case as a predicate for the later consideration of punitive damages)
 
 [1]
 
 two months
 
 before
 
 the jury’s consideration of, and verdict deciding, the intertwined issues of causation, reliance, and comparative fault.
 

 Because of the prejudice inherent in the premature, first-phase gross negligence finding, we do not address in detail other aspects of the trial. Our conclusion regarding the “trifurcation” issue renders moot or pretermits our consideration of most of the other parts of the jury’s verdicts and the remaining points on appeal and cross-appeal.
 

 I.
 
 The Bifurcation Rulings
 

 The trial court’s good intentions are apparent from this record, and the bifurcation of liability and damages is ordinarily within the sound discretion of the trial court. Florida Rule of Civil Procedure 1.270(b);
 
 Rosean v. Town Square Ass’n,
 
 810 So.2d 516 (Fla. 4th DCA 2001). The salutary objectives of judicial economy (no phase II damages trial is required if the jury returns a defense verdict in phase I), and the reduction of a longer case into more digestible “phases,” often support bifurcation and the exercise of that discretion. These objectives are much harder to achieve, however, in a complex case brought by plaintiffs not in privity with the accounting firm/defendant. In such a case, liability ultimately turns on specific demonstrations of knowledge, intent, and reliance.
 
 [2]
 
 The evidence pertaining to those issues is inextricably intertwined with the claims and affirmative defenses on issues of comparative fault, causation, and gross negligence.
 

 In this case, the parties did not move for bifurcation. The trial court notified the parties that the case would be tried in phases. First, the jury would hear evidence on whether BDO breached its professional duties to its former client, the bankrupt non-party E.S. Bankest L.L.C. (“Bankest”), whether BDO’s duties extended to the appellees and, if so, whether the appellees relied on BDO’s audit reports. Second, if the first phase culminated in a verdict finding duty and breach of duty, a trial on damages would proceed. This plan was later modified, however.
 

 The trial court ultimately determined that comparative fault and causation issues
 
 *876
 
 would be tried and determined in the second, compensatory damages phase rather than in the first phase. The question of whether BDO was “personally guilty of gross negligence”
 
 [3]
 
 would be determined in the first phase. The jury would then be asked at the close of phase II whether Banco was entitled to punitive damages against BDO (and if so, the amount of those punitive damages would be determined in phase III). This meant that the phase I jury deliberation regarding negligence
 
 and gross negligence
 
 did not include specific evaluations of the alleged negligence and fault, including failures to report or act, on the part of the Banco parties and ten third-party or Fabre
 
 [4]
 
 actors. Those determinations occurred instead at the close of phase II, when all of the evidence in that phase was viewed against the backdrop that BDO had already been found not merely negligent, but so negligent (or “guilty”) as to arise to the level of intentional disregard for the rights of others. The jury’s phase I finding of gross negligence required them to find that “guilt” by clear and convincing evidence as well, and they were reminded of this in the phase II instruction on “entitlement” to punitive damages:
 

 You already have found Defendant BDO Seidman grossly negligent by clear and convincing evidence. If you now find for Plaintiff ESB Finance or Plaintiff Banco Espirito Santo, S.A. (Nassau Branch) and against Defendant BDO Seidman, you should consider whether in addition to compensatory damages, Plaintiffs are entitled to punitive damages in the circumstances of this case as punishment and as a deterrent to others.
 

 As noted, the jury returned a phase II verdict finding no comparative fault by Banco or others, finding compensatory damages totaling $170 million, and finding an entitlement to punitive damages. The next day, the jury returned its phase III verdict for $351,689,343.
 

 II.
 
 Analysis
 

 A.
 
 The Impact of the Phase I Gross Negligence Verdict
 

 Punitive damages are a form of extraordinary relief for acts and omissions so egregious as to jeopardize not only the particular plaintiff in the lawsuit, but the public as a whole, such that a punishment — not merely compensation — must be imposed to prevent similar conduct in the future:
 

 Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its wrongful conduct and to deter similar misconduct by it and other actors in the future.
 
 See W.R. Grace & Co.-Conn. v. Waters,
 
 638 So.2d 502, 504 (Fla.1994); see also
 
 White Constr. Co. v. Dupont,
 
 455 So.2d 1026, 1028 (Fla.1984);
 
 St. Regis Paper Co. v. Watson,
 
 428 So.2d 243, 247 (Fla.1983). In
 
 White Construction Co.,
 
 we reaffirmed the standard necessary to justify the imposition of punitive damages:
 

 The character of negligence necessary to sustain an award of punitive damages must be of a “gross and flagrant character, evincing reckless disregard of human life, or of the safety of persons exposed to its dangerous effects, or there is that entire want of care which raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of
 
 *877
 
 the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them.”
 

 455 So.2d at 1029 (quoting
 
 Carraway v. Revell,
 
 116 So.2d 16, 20 n. 12 (Fla.1959)). Hence punitive damages are appropriate when a defendant engages in conduct which is fraudulent, malicious, deliberately violent or oppressive, or committed with such gross negligence as to indicate a wanton disregard for the rights and safety of others.
 

 Owens-Corning Fiberglas Corp. v. Ballard,
 
 749 So.2d 483, 486 (Fla.1999) (footnote omitted).
 

 The Legislature codified the definition of “gross negligence” (as a predicate for a punitive damages claim) in section 768.72(2)(b), Florida Statutes (2007):
 

 “Gross negligence” means that the defendant’s conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct.
 

 This definition is also found in the standard jury instruction on punitive damages
 
 [5]
 
 as adapted and given in this case. The phase I jury instructions at issue here did not use the specific term “punitive damages,” but they did include the definition of “gross negligence” in the standard instruction and the further requirement that the standard of proof for such a finding is “by clear and convincing evidence”:
 

 “Clear and convincing evidence” differs from the “greater weight of the evidence” in that it is more compelling and persuasive. “Greater weight of the evidence” means the more persuasive and convincing force and effect of the entire evidence in the case. In contrast, “clear and convincing evidence” is “evidence that is precise, explicit, lacking in confusion, and of such weight that it produces a firm belief or conviction, without hesitation, about the matter in issue” (emphasis added).
 

 Thus, two months before the jury retired in phase II to deliberate whether comparative fault on the part of Banco or ten other specific persons and entities was a legal cause of any damages suffered by Banco, the jurors had already rendered a verdict of “guilt” reflecting their “firm belief or conviction, without hesitation” that BDO was so reckless or wanting in care that its acts and omissions “constituted a conscious disregard or indifference to the rights of persons exposed to its conduct.” And in phase II argument, counsel for Banco reminded the jury in no uncertain terms that they had already reached such a conclusion.
 
 [6]
 

 B.
 
 Mullen and Engle
 

 In defense of this unusual order of proof and factfinding, Banco relies upon
 
 Mullen v. Treasure Chest Casino, LLC,
 
 186 F.3d 620 (5th Cir.1999), a case cited favorably by our Supreme Court in
 
 Engle v. Liggett Group, Inc.,
 
 945 So.2d 1246, 1270 (Fla.2006). We do not find Banco’s argument persuasive, however, as
 
 Mullen
 
 and
 
 Engle
 
 involved bifurcation issues in class actions,
 
 [7]
 
 another level of complexity that is not pertinent here. Those cases considered a division of fact-finding between mass tort issues that are appropriate for class adjudication (liability, affirmative defenses ap
 
 *878
 
 plicable to all class members, and predicate requirements for consideration of an award of punitive damages) and those issues only appropriate for individual determinations (causation, actual damages, and comparative fault).
 

 In those cases, bifurcation was permitted so long as the same issue would not be reexamined by different juries.
 
 Mullen,
 
 186 F.3d at 628. The underlying rationale for permitting the class-phase/individual-phase bifurcation is the avoidance of hundreds of trials on the same (common, class-phase) issues of fact. In this case, in contrast, only two related Banco claimants actually sought recovery against a single defendant based on a single set of operative facts. No class claim was asserted. There was no class-type rationale for allowing the jury to determine the pivotally-important gross negligence/punitive damage finding before it deliberated and determined the interwoven causation and comparative fault issues.
 

 Mullen
 
 did not involve a claim for punitive damages, much less any consideration of whether the predicate findings on entitlement to such damages could be rendered before the individual issues of causation, damages, and comparative fault were to be heard by the same jury. That opinion does, however, cite several other federal bifurcated class actions in which punitive damages were to be resolved commonly and other issues would be tried individually.
 
 Mullen,
 
 186 F.3d at 628. The Supreme Court of Florida found
 
 Mullen
 
 persuasive on the constitutionality
 
 [8]
 
 of bifurcation in class actions involving two jury trials (phase one on common class issues, phase two on issues unique to each individual claimant).
 
 Engle,
 
 945 So.2d at 1270-71.
 

 But on the point involved here — whether evidence regarding causation and comparative fault can be considered in a separate phase after the same jury has found the factual predicate for punitive damages— the majority decision in
 
 Engle
 
 held that the trial court erred in allowing the jury to find entitlement to punitive damages during phase I.
 
 Engle
 
 holds that such a determination was “premature.”
 
 Id.
 
 at 1269. Two Justices dissented from that holding. Their analysis is essentially the argument advanced by Banco here: a jury verdict in phase I holding that BDO was “grossly negligent” was not a finding of “entitlement to punitive damages,” or “liability for punitive damages,” which was properly determined in phase II.
 

 The
 
 Engle
 
 majority’s holding is controlling. The phase I finding of breach of duty “did not constitute ‘a finding of liability,’ ” because in phase II the jury might conceivably have found for BDO on legal causation and comparative fault. If the jury had done so, that “would have precluded the jury from awarding compensatory or punitive damages.”
 
 Id.
 
 at 1263. This is also a practical rule to follow, because here phase II seems akin to shooting fish in a barrel. The jurors should have been allowed to consider
 
 all
 
 of the evidence on causation and other allegedly-responsible actors as they decided whether “the conduct of [BDO] was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of persons exposed to its conduct.” For example, it seems impossible for the jury in phase II to weigh objectively (and under a “mere preponderance” standard) the alleged effect of the acts and omissions of Banco’s Victor Balestra
 
 [9]
 
 against BDO’s
 
 *879
 
 conduct two months
 
 after
 
 finding (under a “clear and convincing” standard) that BDO was reckless and consciously indifferent to the rights of anyone (appellees or otherwise) exposed to BDO’s conduct.
 

 C.
 
 Banco’s “Same Evidence” Argument
 

 Banco also argues that the “fine line” between simple and gross negligence made it appropriate for the jury to determine duty and breach for both simple and gross negligence in phase I. In further support of this proposition, Banco cites numerous cases in which a jury decided whether a defendant’s conduct in a particular case constituted simple negligence
 
 or
 
 gross negligence. In those cases, however, there was no bifurcation. There were no comparative fault issues. Each of the cases involved a trial in which the distinction between simple and gross negligence was a critical element of liability (by virtue of Florida’s guest automotive passenger statute, former section 320.59, Florida Statutes, repealed in 1972,
 
 [10]
 
 or because of the gross negligence exception to worker’s compensation exclusivity and immunity
 
 [11]
 
 in earlier versions of chapter 440).
 

 In one case cited by Banco, this Court relied upon and quoted the Supreme Court of Florida’s holding in
 
 Faircloth v. Hill,
 
 85 So.2d 870, 872 (Fla.1956):
 

 While each separate act involved in the drama might not in and of itself establish gross negligence, nevertheless, the entire course of conduct of the automobile driver under all of the circumstances and in the light of all the related factors taken collectively might well establish the existence of gross negligence-(emphasis added).
 

 Madden v. Killinger,
 
 97 So.2d 205, 206 (Fla. 3d DCA 1957). Similarly, in
 
 Hellweg v. Holmquist,
 
 203 So.2d 209, 211 (Fla. 4th DCA 1967), also cited by Banco, a driver’s gross negligence in an automobile accident was said to depend upon “the time, location, amount of traffic, physical conditions, and all other elements that affect travel.”
 

 While an accounting firm’s conduct of an audit is quite different than the operation of an automobile, a “gross negligence” finding in either case should be based upon a thorough consideration of all of the evidence bearing on causation, reliance, and comparative fault. In this case, some of that evidence was not admitted until well after a verdict of gross negligence already had been rendered. Banco’s “same evidence for simple and gross negligence” argument might prove persuasive in a case in which only the defendant’s conduct mattered. But in this case, the jury did not consider the same evidence for anything but the “breach of duty” element of simple negligence. Causation, reliance, and comparative fault evidence, bearing directly on damages as an element of liability for simple negligence, was presented after gross negligence had already been determined.
 

 III.
 
 Other Issues
 

 As noted at the outset of this opinion, our conclusion on “trifurcation” obviates the need for extended analysis of the other issues raised by the parties. We briefly address three points to assist the parties and the trial court in a re-trial:
 

 
 *880
 
 A.
 
 Hearsay
 

 A court-appointed receiver or trustee is ordinarily a successor records custodian and may establish the necessary foundation for the admission of the defunct entity’s records of regularly conducted business activity for purposes of section 90.803(6) and (7), Florida Statutes (2009). Similarly, the receiver or trustee may testify from personal knowledge regarding relevant aspects of his or her own personal investigation of the business failure and liquidation or reorganization of the entity. There is, however, no broad exemption from the rules of evidence that would allow a receiver or trustee to introduce hearsay, or hearsay within hearsay, regarding statements by out of court declarants.
 

 BDO argues that the trial court erred by taking judicial notice of a bankruptcy court order, and allowing that order to be shown to the jury.
 
 [12]
 
 The trial court took the view that the facts determined by the bankruptcy court were properly admissible in this case. BDO’s objection should have been sustained.
 

 “Inadmissible evidence does not become admissible because it is included in a judicially noticed court file.” The Florida Bar,
 
 Evidence in Florida
 
 § 2.12, at 2-7 (7th ed.2008). “Although a trial court may take judicial notice of court records, it does not follow that this provision permits the wholesale admission of all hearsay statements contained within those court records.”
 
 Stoll v. State,
 
 762 So.2d 870, 876 (Fla.2000) (citation omitted). “[Tjhere has been a ‘seemingly widespread but mistaken notion that an item is judicially noticeable merely because it is part of the “court file.” ’ ”
 
 Id.
 
 at 877 (citation omitted).
 

 “A court judgment is hearsay ‘to the extent that it is offered to prove the truth of the matters asserted in the judgment.’ ”
 
 United States v. Sine,
 
 493 F.3d 1021, 1036 (9th Cir.2007) (citation omitted). As to those matters, there must be an applicable hearsay exception.
 
 Stoll,
 
 762 So.2d at 876; § 90.805 (2009);
 
 see also
 
 Charles W. Ehrhardt,
 
 Ehrhardt’s Florida Evidence
 
 § 204.2, at 85 & n. 5 (2009).
 

 Under the Evidence Code, a request for judicial notice is also subject to analysis under section 90.403, Florida Statutes.
 
 See
 
 § 90.204, Fla. Stat. “[J]udicial findings of fact ‘present a rare case where, by virtue of their having been made by a judge, they would likely be given undue weight by the jury, thus creating a serious danger of unfair prejudice.’ ”
 
 Nipper v. Snipes,
 
 7 F.3d 415, 418 (4th Cir.1993);
 
 see also Secada v. Weinstein,
 
 563 So.2d 172, 173-74 (Fla. 3d DCA 1990). For these reasons, the subject bankruptcy order was not a proper subject of judicial notice, nor properly admissible in evidence.
 

 Another bankruptcy order was also introduced into evidence (rather than being judicially noticed).
 
 [13]
 
 For the reasons explained above, BDO’s objection to its introduction also should have been sustained.
 

 B.
 
 Reliance By Noteholders
 

 The case went to the jury on two theories of reliance. One was the alleged reli-
 
 *881
 
 anee in 2002 by ESB Finance, Ltd., a special purpose entity formed by Espirito Santo International, S.A., when ESB Finance acquired the “several hundred” promissory notes issued earlier by Bank-est. An officer of ESB Finance and an officer of Bankest testified that the BDO audit partner assented to ESB Finance’s rebanee on the BDO audit reports on Bankest’s financial statements, though this was denied by the BDO partner, thus creating a jury question under
 
 Max Mitchell.
 

 But Banco also argued a second theory in the trial court and here — that the note-holders themselves were intended by BDO to rely on the BDO audit reports on Bank-est. Banco argues that the noteholders relied, and were understood by BDO to be relying, on the BDO-audited statements because those statements were part of the private placement memoranda provided to each such noteholder. Banco later purchased the notes from the noteholders, who assigned their rights to ESB Finance. By reason of the assignments, ESB Finance stood in the shoes of the notehold-ers.
 

 To show noteholder reliance, Banco had to comply with the test outlined in Restatement (Second) of Torts section 552, which was adopted in
 
 Max Mitchell,
 
 558 So.2d at 15-16. Under that test, BDO would have potential liability only if BDO knew, at the time it was hired for a particular audit, that the audit would be used as part of a private placement memorandum which was to be given to prospective purchasers of the notes.
 
 Max Mitchell,
 
 558 So.2d at 15-16. Alternatively, BDO would also be covered by
 
 Max Mitchell
 
 if BDO subsequently affirmatively consented to the audit report’s inclusion in the private placement memoranda.
 

 With regard to Bankest’s 1998 and 1999 private placement memoranda, it is undisputed that the BDO audit reports were not attached. Banco argues, however, that reliance was proven because two witnesses testified that some of the prospective purchasers of the 1998 and 1999 notes received the BDO audit reports for other reasons. The fact that a prospective purchaser obtained an audit report for another reason is insufficient to impose liabihty under
 
 Max Mitchell.
 
 The
 
 Max Mitchell
 
 decision cites with approval illustration 10 of Restatement section 552, as follows:
 

 10. A, an independent public accountant, is retained by B Company to conduct an annual audit of the customary scope for the corporation and to furnish his opinion on the corporation’s financial statements. A is not informed of any intended use of the financial statements; but A knows that the financial statements, accompanied by an auditor’s opinion, are customarily used in a wide variety of financial transactions by the corporation and that they may be rebed upon by lenders, investors, shareholders, creditors, purchasers and the like, in numerous possible kinds of transactions. In fact B Company uses the financial statements and accompanying auditor’s opinion to obtain a loan from X Bank. Because of A’s negligence, he issues an unqualifiedly favorable opinion upon a balance sheet that materially misstates the financial position of B Company, and through reliance upon it X Bank suffers pecuniary loss. A is not liable to X Bank.
 

 558 So.2d at 15 (emphasis added). The proof of reliance in this case was inadequate with regard to the holders of the 1998 and 1999 notes.
 
 [14]
 

 
 *882
 
 We next consider any private placement memoranda which actually included BDO audit reports, and where BDO knew that this was an intended use at the time BDO was hired, or BDO affirmatively consented to such use. Banco must then prove individualized reliance by each noteholder.
 
 Lance v. Wade,
 
 457 So.2d 1008, 1011 (Fla.1984).
 

 Banco maintains that it can prove individual reliance by calling just one note-holder to testify that he or she relied on the BDO audits. Banco contends that because the private placement memoranda and audit for any particular note series were identical, it can be inferred that every nontestifying noteholder had the same reliance as the testifying noteholder. We disagree. As stated in
 
 Lance,
 
 “What one purchaser may rely upon in entering into a contract may not be material to another purchaser.” 457 So.2d at 1011. The case cited by Banco,
 
 Klay v. Humana, Inc.,
 
 382 F.3d 1241 (11th Cir.2004), involves a different issue. The
 
 Klay
 
 decision acknowledges that “each plaintiff must prove his own reliance in this case....”
 
 Id.
 
 at 1259. The
 
 Klay
 
 court was considering whether, for purpose of class certification, the common issues of fact regarding reliance outweighed the individual issues, and concluded that under the facts of that case, the common issues predominated.
 
 Id.
 

 Banco also argues that it may prove reliance by indirect means. Banco maintains that the noteholders relied on Banco, which in turn relied on BDO’s financial statements. For this proposition Banco relies on
 
 Joseph v. Novman LaPorte Realty, Inc.,
 
 508 So.2d 496, 497 (Fla. 3d DCA 1987), which involved construction of a swimming pool. The present case involves accountant liability, on which
 
 Max Mitchell
 
 is controlling. This part of Banco’s argument runs counter to
 
 Max Mitchell
 
 and illustration 10 of section 552, quoted above.
 

 C.
 
 Punitive Damages
 

 The amount of punitive damages assessed against BDO exceeded several-fold BDO’s net worth according to the phase III record. While it is true that BDO, like most professional service firms, distributed substantially all of its annual net income to its partners (leaving a year-end net worth much lower than annual net income), the $351 million punitive damages award would plainly “lead to [the defendant’s] financial demise.”
 
 Lipsig v. Ramlawi,
 
 760 So.2d 170, 189 (Fla. 3d DCA 2000). An accounting firm that must distribute its net income and net worth to judgment creditors rather than the partners who produced that income will not have partners (or clients) for long. But for our decision to remand for a new trial on the “trifurcation” issue, we would have been compelled to find an abuse of discretion in the denial of BDO’s post-trial motion for a remittitur regarding the punitive damages.
 

 IV.
 
 Conclusion
 

 The trial of this case consumed four months of attentive service by a jury and a dedicated trial judge.
 
 [15]
 
 We have carefully considered every substantive and procedural authority that might be applied to preserve at least some of the jury’s findings.
 

 In this case, however, no such balm is to be found. The fact issues are, to use that word that frustrates bifurcation, “intertwined.” The cart cannot lead the horse. But if nothing else, the trifurcated trial has identified those evidentiary disputes (publication of excerpts from a plan of reorganization and statements by an out-of-court
 
 *883
 
 prosecutor, for example) that may be resolved in a pretrial conference on remand and in a streamlined,
 
 [16]
 
 two-phase trial. We have also provided guidance on other issues in an effort to assist the trial court on remand. All issues except the quantum of punitive damages can be determined in phase I. If entitlement to punitive damages is found in phase I, quantum of punitive damages can be determined in phase II.
 

 Reversed and remanded for further proceedings in accordance with this opinion.
 

 [1]
 

 . As the jury was instructed at the close of that first phase, "gross negligence means you find by clear and convincing evidence that the conduct of BDO Seidman was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights of persons exposed to its conduct.”
 

 [2]
 

 .
 
 First Fla. Bank, N.A. v. Max Mitchell & Co.,
 
 558 So.2d 9, 15 (Fla.1990) (‘
 
 ‘Max Mitchell ”).
 

 [3]
 

 . “Guilty of gross negligence” is part of the standard jury instruction on punitive damages and is the precise wording given to the jury in phase I of the trial here.
 

 [4]
 

 .
 
 Fabre v. Marin,
 
 623 So.2d 1182 (Fla.1993).
 

 [5]
 

 .
 
 Standard Jury Instructions
 
 — Civil
 
 Cases (No. 00-2),
 
 797 So.2d 1199 (Fla.2001).
 

 [6]
 

 . Indeed, counsel argued to both the jury and the trial court that BDO’s evidence and argument on causation in phase II were in defiance of the jury’s phase I verdict.
 

 [7]
 

 .Mullen
 
 involved a class action brought by former employees of a floating casino alleging that the vessel’s ventilation system caused respiratory illnesses, while
 
 Engle
 
 considered Florida-based claims for damages allegedly caused by addiction to cigarettes containing nicotine.
 

 [8]
 

 . In federal cases, the Seventh Amendment to the United States Constitution, and in state court cases in Florida, article I, section 22, of the Florida Constitution, prohibit the reconsideration of a jury's findings on a defendant’s conduct by a different jury.
 

 [9]
 

 . Balestra was simultaneously vice chairman of BDO's client (Bankest, the fraudulent Mia
 
 *879
 
 mi factoring company), president of the Espirito Santo Bank (one-half owner of Bankest) in Miami, and a director of ESB Finance Ltd. (the special-purpose entity formed to purchase $140 million in notes (as a result of the fraud, notes ultimately worth about 10 cents on the dollar)) originally issued to worldwide customers of Espirito Santo International, S.A.
 

 [10]
 

 .
 
 See, e.g., Madden v. Killinger,
 
 97 So.2d 205 (Fla. 3d DCA 1957);
 
 Foy v. Fleming,
 
 168 So.2d 177 (Fla. 1st DCA 1964).
 

 [11]
 

 .
 
 See Courtney v. Florida Transformer, Inc.,
 
 549 So.2d 1061 (Fla. 1st DCA 1989).
 

 [12]
 

 .
 
 In re: E.S. Rankest, L.C.,
 
 321 B.R. 588 (Bankr.S.D.Fla. 2005) (Opinion (1) granting Joint Motion of Lewis B. Freeman and Banco Espirito Santo International, LTD. for Final Summary Judgment Disallowing Claims filed by BDO Seidman, LLP, and (2) Denying BDO Seidman, LLP’s Motion for Summary Judgment).
 

 [13]
 

 .
 
 In re: E.S. Bankest, L.C.,
 
 321 B.R. 588 (Bankr.S.D.Fla. 2005) (Order Granting Judgment on Partial Findings in Favor of Respondents on the Motion by Gunster, Yoaldey & Stewart, P.A. for an Order (I) Converting Chapter 11 Case to Case under Chapter 7 of the Bankruptcy Code, or (II) Appointing chapter 11 Trustee, or (III) Appointing an Examiner, Pursuant to 11 U.S.C. § 1112(B) and Bankruptcy Rule 9014).
 

 [14]
 

 . If private placement memoranda were issued for other years without BDO audits, the same principles would apply.
 

 [15]
 

 . Because of a prior mistrial correctly granted by the trial court, the trial judge actually expended over seven months of trial time on the case, in addition to the pretrial motions and hearings considered over the preceding three years.
 

 [16]
 

 . "Streamlined” would hardly seem to apply to a trial that previously took four months. It does appear, from a complete review of the transcript, that phases I and II overlapped in part as to various witnesses and the related cross-examination. Telescoping these phases and witnesses into a single phase may actually reduce the cumulative number of trial days on remand.