# Third District Court of Appeal
## State of Florida

Opinion filed June 11, 2025.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D24-0569
Lower Tribunal No. 20-8726-CA-01
_____

**Monsanto Company**,
Appellant,

vs.

**Lawrence J. Behar**,
Appellee.

An Appeal from a non-final order from the Circuit Court for Miami-Dade County, Jose M. Rodriguez, Judge.

Shook, Hardy & Bacon, L.L.P., and Antar K. Vaughan, Mihai M. Vrasmasu, Lori-Ann C. Ridley and Jarvis C. James (Tampa); Bryan Cave Leighton Paisner LLP, and Kenneth Lee Marshall (San Francisco, CA), and Christian M. Poland (Chicago, IL), for appellant.

Podhurst Orseck, P.A., and Christina H. Martinez, for appellee.

Before LOGUE, C.J., and LOBREE and GOODEN, JJ.

GOODEN, J.

Appellant Monsanto Company appeals an order granting Appellee Lawrence J. Behar's motion to amend his complaint to add punitive damages. Because Behar failed to satisfy the statutory requirements, we reverse.

**I.**

**A.**

Glyphosate, the active ingredient in Monsanto's Roundup weed killer, is a widely used herbicide. It is approved for use in over 160 countries. Nat'l Ass'n of Wheat Growers v. Bonta, 85 F.4th 1263, 1268–69 (9th Cir. 2023).

In the United States, glyphosate is regulated by the Environmental Protection Agency under the Federal Insecticide, Fungicide, and Rodenticide Act. See 7 U.S.C. § 136 et. seq. For an herbicide to be approved for commercial use under the Act, an applicant must show that it will not cause unreasonable adverse effects on humans or the environment. 7 U.S.C. § 136(bb). As part of that process, the EPA reviews the product for carcinogenicity and performs a risk assessment. Id. The EPA then reassesses the approval at least once every fifteen years. 7 U.S.C. § 136a(g)(1)(A)(i), (iv).

The EPA further dictates the label of the product, which the manufacturer must use without modification. 7 U.S.C. § 136j(a)(1)(E). It

2

controls any changes to the label.  Thus, manufacturers cannot—without prior approval—add new warnings or precautionary statements to the product.  It is unlawful to do so.  Id.

In 1974, the EPA approved glyphosate.  Since that time, the EPA has repeatedly examined glyphosate.  For instance, in 1983, a study had raised concerns about potential carcinogenicity.  After reviewing that data, the EPA initially classified glyphosate as a Group C carcinogen, meaning that it is possibly carcinogenic to humans.  Thereafter, the EPA rigorously re-evaluated glyphosate's effects on human health, considered numerous carcinogenicity studies in rats and mice, and found that none showed convincing evidence that glyphosate could be a carcinogen.  Several years later, the EPA reclassified glyphosate as a Group E carcinogen, meaning there was "evidence of non-carcinogenicity in humans."

But in 2015, the International Agency for Research of Cancer[1] performed a hazard assessment, which considered whether the agent can

---

[1] This organization is not a regulatory agency and is connected to the World Health Organization ("WHO").  Unlike the EPA, it did not perform risk assessments, which analyze cancer risks to humans at real-world exposure levels.  "[T]he distinction between hazard and risk is significant.  In this context, a hazard indicates that at some theoretical level of exposure, the chemical is capable of causing cancer.  Risk, on the other hand, is the likelihood that cancer will occur at a real-world level of exposure."  Nat'l Ass'n of Wheat Growers, 85 F.4th at 1269.  International Agency for Research of Cancer "stands essentially alone in its determination that glyphosate is

cause cancer under *any* possible circumstances, without considering actual risk from typical human exposure in typical human uses. It issued a monograph asserting that glyphosate is "probably carcinogenic to humans." It noted "limited evidence in humans for the carcinogenicity of glyphosate" and "sufficient evidence in experimental animals for the carcinogenicity of glyphosate." This monograph associated glyphosate with non-Hodgkin's lymphoma, "but chance, bias or confounding could not be ruled out with reasonable confidence." Thereafter, Monsanto was flooded with lawsuits around the country.

In the years following the International Agency for Research of Cancer's monograph, numerous studies were conducted. In 2018, the Agricultural Health Study was released. This large cohort study was based on long-term epidemiological research and tested over 50,000 subjects. Based on the study results, the Journal of the National Cancer Institute published data demonstrating no apparent association between glyphosate and non-Hodgkin's lymphoma.

The EPA also reexamined glyphosate. The EPA reaffirmed that glyphosate is "not likely to be carcinogenic to humans." It disagreed with the

probably carcinogenic to humans, while EPA, OEHHA, and regulators from around the world conclude that it is not." Id. at 1278.

4

International Agency for Research of Cancer, attacked the methodology used in the monograph and the lack of public comment, and explained its scientists have performed an independent evaluation of all the data available—including the later-released data noted above. As a result, the EPA determined that a label warning stating that glyphosate poses a cancer risk would be "false and misleading" and that any such label would not meet the requirements of the Federal Insecticide, Fungicide, and Rodenticide Act.

Again, in 2020, the EPA evaluated glyphosate and reaffirmed its findings—"EPA has thoroughly evaluated potential human health risk associated with exposure to glyphosate and determined that there are no risks to human health from the current registered uses of glyphosate and that glyphosate is not likely to be carcinogenic to humans." Two years later, the EPA sent a letter to California's Office of Environmental Health Hazard Assessment, standing behind "its robust scientific evaluation of the carcinogenic potential of glyphosate."

The EPA's findings are consistent with other regulatory authorities from around the world. For example, the European Union Chemicals Agency concluded that "based on the epidemiological data as well as the data from long-term studies in rats and mice, taking a weight of evidence approach, no classification for carcinogenicity is warranted." Likewise, Health Canada

5

concluded glyphosate "is not genotoxic and is unlikely to pose a human cancer risk." Similarly, the agencies in Australia, Germany, New Zealand, and Japan have all rejected the contention that glyphosate causes cancer.

Nevertheless, in 2023, Monsanto ceased production of all glyphosate-based herbicides. It did so to "manage litigation risk" given the number of lawsuits filed and amounts of awards against it. This decision was "not because of any concern about potential carcinogenicity of the products." The remaining inventory of glyphosate products were estimated to be sold by July 2024.

**B.**

Behar was diagnosed with non-Hodgkin's lymphoma. Attributing his diagnosis to Roundup, Behar filed suit against Monsanto alleging five claims: strict products liability, negligence, breach of express warranties, fraudulent misrepresentation, and negligent misrepresentation. Behar contends that the Roundup label should have warned that glyphosate causes cancer.

During litigation, Behar moved for leave to amend his complaint to assert a claim for punitive damages. He asserted that Monsanto "engaged in a systematic effort to discredit the unfavorable science, create new science through 'ghost-writing,' and manipulate federal agencies through the

6

use of disinformation."  Among other facts and documents, Behar heavily relies upon:

- The International Agency for Research of Cancer's monograph.

- In the 1970s and 1990s, Monsanto hired two independent laboratories to perform testing.  The labs were accused of falsifying records and results.  Several lab executives were convicted of fraud.

- After the 1985 classification as a Group C carcinogen, internal Monsanto documents show various mid-level employees discussing the classification and how the company could address it.  This includes scientists discussing various studies and some expressing concerns.

- After the 1985 classification, Monsanto hired Dr. Parry, a toxicologist specializing in genetic toxicology, as an expert.  He advised that glyphosate may be genotoxic and further in vitro micronucleaus testing is needed to confirm.  Emails were included discussing Dr. Parry's results and suggesting "to provide him with additional information as well as asking him to critically evaluate the quality of all the data including the open literature."

- Studies that Monsanto allegedly "ghost-wrote."

Monsanto maintained that Behar did not meet his burden.  Relying on numerous studies conducted by agencies worldwide, Monsanto explained that Behar's record evidence has been rejected by the EPA and other regulatory agencies.  Further, Monsanto made clear it had nothing to do with the independent labs' actions and that it was a victim of fraud.  Regarding Dr. Parry, Monsanto completed many of the studies that he suggested, and

7

as a result, Dr. Parry eventually changed his mind on glyphosate's potential carcinogenicity. Lastly, the alleged "ghostwritten" articles acknowledge Monsanto's contributions.

Citing section 768.73, Florida Statutes, Monsanto further contended that it could not be held liable for punitive damages based on conduct for which punitive damages have been awarded in another case. In the first three Roundup trials, juries in other jurisdictions awarded $250 million, $75 million, and $2 billion in punitive damages against Monsanto for the very same conduct. See Johnson v. Monsanto Co., 266 Cal. Rptr. 3d 111, 120 (Cal. Ct. App. 2020); Hardeman v. Monsanto Co., 997 F.3d 941, 954 (9th Cir. 2021); Pilliod v. Monsanto Co., 282 Cal. Rptr. 3d 679, 688 (Cal. Ct. App. 2021).[2] Accordingly, it argued that any amendment would be futile.

The trial court heard argument from the parties. Behar pointed to the three trials as proof that this evidence meets the standard for punitive damages. Monsanto countered that Behar cherry-picked various materials

---

[2] Likewise, juries have rejected the claims against Monsanto. See, e.g., Kline v. Monsanto Co., 2024 WL 1608102 (Pa. Com. Pl. Ct. Mar. 5, 2024); Cody v. Monsanto Co., No. 15CV-23-75 (Ark. Cir. Ct.); Adams v. Monsanto Co., 2023 WL 4289672 (Mo. Cir. Ct. May 23, 2023); Evard v. Monsanto Co., 2023 WL 8167796 (Ill. Cir. Ct. Sep. 10, 2023); Alesi v. Monsanto Co., 2022 WL 17224403 (Mo Cir. Ct. Sep. 29, 2022); Shelton v. Monsanto Co., 2022 WL 2960512 (Mo Cir. Ct. Jun. 9, 2022).

and tried to piece them together to show malfeasance—ignoring the overwhelming scientific evidence on glyphosate. It insisted that Behar failed to meet his burden.

The trial court granted the motion, simply stating "I'm going to find that a reasonable showing for me to grant the motion for leave to amend." No other reasoning or findings were given. This appeal followed.

## II.

Since we are in the same position as the trial court to review the record evidence or proffer to support a party's claim for punitive damages, our review is de novo. Grove Isle Ass'n, Inc. v. Lindzon, 350 So. 3d 826, 829 (Fla. 3d DCA 2022).

## III.

"Punitive damages are a form of extraordinary relief for acts and omissions so egregious as to jeopardize not only the particular plaintiff in the lawsuit, but the public as a whole, such that a punishment—not merely compensation—must be imposed to prevent similar conduct in the future." BDO Seidman, LLP v. Banco Espirito Santo Int'l., 38 So. 3d 874, 876 (Fla. 3d DCA 2010). Accord Owens-Corning Fiberglas Corp. v. Ballard, 749 So. 2d 483, 486 (Fla. 1999) ("Under Florida law, the purpose of punitive damages is not to further compensate the plaintiff, but to punish the defendant for its

9

wrongful conduct and to deter similar misconduct by it and other actors in the future."). Such damages are "reserved for only the most egregious cases." Friedler v. Faena Hotels & Residences, LLC, 390 So. 3d 186, 188 (Fla. 3d DCA 2024).

Section 768.72, Florida Statutes, controls much of the punitive damage amendment process. Under this section, the trial court performs a gatekeeping function ensuring that the requisite statutory showing has been met. JVA Eng'g Contractor, Inc. v. Doral 10, LLC, 402 So. 3d 1175, 1176 (Fla. 3d DCA 2025). "The gatekeeper role also extends to the trial court's determining whether the movant has satisfied the requirements of subsection 768.72(3)." Id. at 1177.

"The statutory framework presumes that punitive damages claims will be the exception in civil actions, not the rule." McLane Foodservice Inc. v. Wool, 400 So. 3d 757, 760 (Fla. 3d DCA 2024). "Plaintiffs have no right to punitive damages." Blundell v. R. J. Reynolds Tobacco Co., 324 So. 3d 1014, 1016 (Fla. 1st DCA 2021). Indeed, the plaintiff's claim is "subject to the plenary authority of the legislature." Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1358 (Fla. 1994).

A plaintiff is not allowed to bring a claim for punitive damages "unless there is a reasonable showing by evidence in the record or proffered by the

claimant which would provide a reasonable basis for recovery of such damages." § 768.72(1), Fla. Stat. See also Fla. R. Civ. P. 1.190(f) ("A motion for leave to amend a pleading to assert a claim for punitive damages shall make a reasonable showing, by evidence in the record or evidence to be proffered by the claimant, that provides a reasonable basis for recovery of such damages."). That record evidence or proffer must reasonably demonstrate that the defendant was guilty of either "intentional misconduct" or "gross negligence." § 768.72(2), Fla. Stat. The former "means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." § 768.72(2)(a), Fla. Stat. The latter "means that the defendant's conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b), Fla. Stat. See also Valladares v. Bank of Am. Corp., 197 So. 3d 1, 11 (Fla. 2016) (explaining this standard is "equivalent to the conduct involved in criminal manslaughter").

Where a corporate entity is involved, an additional showing is required:

(3) In the case of an employer, principal, corporation, or other legal entity, punitive damages may be imposed for the conduct

11

of an employee or agent only if the conduct of the employee or agent meets the criteria specified in subsection (2) and:

(a)     The employer, principal, corporation, or other legal entity actively and knowingly participated in such conduct;

(b)     The officers, directors, or managers of the employer, principal, corporation, or other legal entity knowingly condoned, ratified, or consented to such conduct; or

(c)     The employer, principal, corporation, or other legal entity engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury suffered by the claimant.

§ 768.72(3), Fla. Stat.[3]  See Napleton's N. Palm Auto Park, Inc. v. Agosto, 364 So. 3d 1103, 1106 (Fla. 4th DCA 2023) ("Thus, to amend a complaint to add a claim for punitive damages against a corporate defendant, a plaintiff must show culpable conduct *at both* the employee level and the corporate level."); McLane Foodservice Inc., 400 So. 3d at 762 ("To ground a punitive damages claim against an employer based on vicarious liability, a plaintiff

---

[3] Notably, Florida's statutory requirements for punitive damages against a corporation differs from California.  California's requisite showing is much lower—considering conduct from any employee with discretionary authority over decisions.  Compare White v. Ultramar, Inc., 981 P.2d 944, 951 (Cal. 1999), with Fla. Power & Light Co. v. Dominguez, 295 So. 3d 1202, 1205 (Fla. 2d DCA 2019) (explaining "a managing agent is an individual like a president or primary owner who holds a position with the corporation which might result in his acts being deemed the acts of the corporation") (cleaned up).  As a result, it was not enough for Behar to simply point to the prior punitive damages awards in California.  Behar was required to meet the Florida requirements.

must establish (1) that the employee's conduct satisfies the definition of intentional misconduct or gross negligence and, as relevant here, (2) that the employer, via its officers, directors, or managers . . . knowingly condoned, ratified, or consented to such conduct.") (internal citation omitted).

Upon our review of the record, we conclude that Behar failed to make a reasonable showing which would provide a reasonable basis for recovery of punitive damages. The allegations, proffer, and record evidence do not demonstrate intentional misconduct or gross negligence. While Monsanto was well-aware of the continued reevaluation of glyphosate since 1973, the record does <u>not</u> show that glyphosate is carcinogenic, Monsanto knew it was, <u>and</u> Monsanto intentionally sold its product without a warning label anyway. § 768.72(2)(a), Fla. Stat. The record similarly does not demonstrate that Monsanto's "conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the life, safety, or rights of persons exposed to such conduct." § 768.72(2)(b), Fla. Stat.

Monsanto reasonably relied on decades of scientific evidence. The EPA has continuously reevaluated glyphosate and approved it for use. The EPA further dictates the label of the product and found that a cancer warning label would be false and misleading. <u>See</u> § 768.1256(1), Fla. Stat. ("In a product liability action brought against a manufacturer or seller for harm

13

allegedly caused by a product, there is a rebuttable presumption that the product is not defective or unreasonably dangerous and the manufacturer or seller is not liable if, at the time the specific unit of the product was sold or delivered to the initial purchaser or user, the aspect of the product that allegedly caused the harm: (a) Complied with federal or state codes, statutes, rules, regulations, or standards relevant to the event causing the death or injury; (b) The codes, statutes, rules, regulations, or standards are designed to prevent the type of harm that allegedly occurred; and (c) Compliance with the codes, statutes, rules, regulations, or standards is required as a condition for selling or distributing the product."). Unsupported, salacious allegations, a scientific outlier, and isolated internal correspondence by mid-level employees—quoted out-of-context—simply do not meet the statutory requirements. See § 768.72(2), (3), Fla. Stat.; Dominguez, 295 So. 3d at 1205.

Punitive damages are reserved for truly culpable and egregious behavior. The allegations and evidence presented fall short of supporting a claim for punitive damages. As a result, the trial court erred by allowing the amendment. Because of this ruling, we do not reach Monsanto's second argument as to application of section 768.73, Florida Statutes, in terms of futility of the amendment.

14

Reversed and remanded.